862 F.2d 414
 David C. WALENTAS, Plaintiff-Appellant,
v.
Kenneth LIPPER, John Doe # 1, John Doe # 2, John Doe # 3,
John Doe # 4, and John Doe # 5, Defendants-Appellees.
 No. 384, Docket 87-7570.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 24, 1987.
Decided Nov. 25, 1988.
 
 Richard S. Fischbein, New York City (Kenneth G. Schwarz, Deborah J. Locitzer, Fischbein Badillo Schwarz Wiener Gruskin & Lederman, New York City, of counsel), for plaintiff-appellant.
 Elizabeth Dvorkin, Asst. Corp. Counsel for the City of New York, New York City (Peter Zimroth, Corp. Counsel for the City of New York, Jeffrey Schonback, Edward F.X. Hart, Asst. Corp. Counsels, New York City, of counsel), for defendants-appellees.
 Before VAN GRAAFEILAND, WINTER and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Plaintiff-appellant David C. Walentas appeals from a judgment of the United States District Court for the Southern District of New York, Louis L. Stanton, Judge, granting defendant-appellee Kenneth Lipper's motion for summary judgment, see Fed.R.Civ.P. 56, on the ground that Lipper is entitled to qualified immunity from suit in this action brought pursuant to 42 U.S.C. Sec. 1983 (1982). Walentas also appeals from an earlier order of the district court which dismissed his complaint, see Fed.R.Civ.P. 12(b)(6), to the extent that it alleged a deprivation of a property interest without due process of law.
 
 
 2
 We affirm.
 
 I. BACKGROUND
 
 3
 Given the procedural posture in which this appeal comes to us, we assume the truth of plaintiff's allegations, see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); Hawkins v. Steingut, 829 F.2d 317, 319 (2d Cir.1987); Luce v. Edelstein, 802 F.2d 49, 52 (2d Cir.1986), upon which this statement of the case's background is substantially based.
 
 
 4
 Plaintiff-appellant David C. Walentas is a prominent New York real estate developer. During the late 1970s, Walentas realized the development potential of certain property on the Brooklyn waterfront located between the Brooklyn and Manhattan bridges. At that time the area, commonly known as the Fulton Ferry landing, was a bleak stretch of land consisting of industrial buildings, abandoned warehouses and rotting piers.
 
 
 5
 Despite the general disrepair of the neighborhood, Walentas was convinced that the area could be revitalized and imitate the success enjoyed by the South Street Seaport, a once similarly blighted area less than a mile away across the East River in Manhattan. He accordingly began to purchase properties in the vicinity in 1981, ultimately acquiring over two million square feet in the area (described by appellant as the "Brooklake properties" because acquired by Brooklake Associates, a New York limited partnership which served as the acquiring entity).
 
 
 6
 Immediately adjacent to the Brooklake properties were several parcels of land, comprising approximately fifteen acres, which were owned in part by the City of New York and in part by the State of New York and contained a number of historically significant properties, albeit in a state of disrepair. On June 3, 1981, the New York City Public Development Corporation ("PDC"), the New York State Urban Development Corporation ("UDC") and the New York State Office of Parks, Recreation and Historic Preservation ("OPRHP"), the agencies charged with overseeing the property (collectively the "Agencies"), jointly issued a Solicitation For Development Proposal (the "SDP") in an effort to secure a developer who would undertake the project of revitalizing these parcels (the "SDP Site").
 
 
 7
 The SDP, which set forth the conditions under which a developer for the SDP site would be chosen, stated that the designation of a developer was to take place in two phases. Initially, one or more developers were to be conditionally designated, based upon initial proposals which would include preliminary development and financial plans together with statements of the applicants' development experience and financial background. Thereafter, the developer or developers selected for further consideration would submit more detailed information concerning its or their proposals, particularly with respect to financial, management and development plans. The final selection of a developer would then be made upon the basis of this information.
 
 
 8
 On May 27, 1982, Walentas, under the trade name Two Trees Management Co., was conditionally designated as the developer of the SDP Site, and accordingly entered into a conditional designation agreement (the "Agreement") with the Agencies. The Agreement gave Walentas the exclusive right to negotiate and thereafter execute a memorandum of intent with the Agencies to be named the final developer of the project. The Agreement had a term of six months, but the Agencies had a unilateral right to extend that period "for continuing negotiations." In fact, the Agreement was once formally extended by the Agencies, and was thereafter informally extended until approximately March, 1984. In addition, the Agreement provided that "the [Agencies] may terminate the negotiations at any time if, in their sole discretion, they are not satisfied with the progress of negotiation or if you [Walentas] fail to satisfy any of the other conditions set forth in [the Agreement]." The Agreement obliged Walentas, inter alia, to provide preliminary plans and construction documents with respect to the project, as well as commitments for necessary financing.
 
 
 9
 As the project proceeded, Walentas obtained from the New York City Board of Estimate approval of an application for a federal Urban Development Action Grant which would have provided up to $20 million in financial assistance to develop the SDP Site. In September, 1983, Walentas submitted a draft Uniform Land Use Review Program application to the City. By the end of that month, the PDC and UDC had reached an agreement with Walentas regarding the physical alterations to be accomplished by Walentas on the waterfront portion of the SDP Site. In September, 1983, Walentas submitted to the New York Industrial and Commerce Incentive Board (the "ICIB") an application for tax reductions for his adjoining Brooklake properties that would have resulted in savings of approximately $12 million over a twenty year period. On October 7, 1983, Walentas reached agreement with the PDC and UDC on the budget for the development of the SDP Site. On November 21, 1983, he submitted an application to the New York Industrial Development Authority for a low interest loan to finance the construction of automobile parking garages at the SDP Site. In or about December, 1983, Lehman Brothers Kuhn Loeb ("Lehman Brothers"), a major investment banking concern, agreed to a lease of a portion of the building known as 1 Main Street which was a part of the Brooklake properties, the finalization of which was dependent upon favorable action by the ICIB upon Walentas' application for tax relief.
 
 
 10
 Defendant Kenneth Lipper was the Deputy Mayor for Finance and Economic Development of the City of New York from January, 1983 until March, 1985. In his capacity as Deputy Mayor, Lipper oversaw the Office of Economic Development, of which the PDC is a component. Prior to his appointment as Deputy Mayor, Lipper had been an investor in two real estate ventures organized and managed by Walentas. During the time the two were partners, Lipper became dissatisfied with the manner in which Walentas managed the ventures. Lipper also blamed Walentas for the suicide of Lipper's friend, J. Frederick Byers III, who was also a partner in Walentas' real estate ventures. Walentas alleges that Lipper had thus developed a personal animosity towards Walentas, as a result of which Lipper used his official powers as Deputy Mayor during early 1984 to interfere with Walentas' development of the SDP Site, culminating in the eventual de-designation of Walentas as the developer of the project.
 
 
 11
 In this connection, Walentas claims that Lipper engaged in the following acts of wrongdoing: (1) Lipper directed the president of PDC to impose additional burdensome restrictions on Walentas, such as finding a new partner who could guarantee financing of the entire project or obtaining an unconditional financing commitment from an institution, and identifying a construction firm of adequate size to handle the project, to be satisfied in less than two months, failing which the city would "automatically terminate all further consideration of [Walentas] as a developer for this site"; (2) at the same time, Lipper "made it known" to potential partners of Walentas that the city would "view [them] with extreme disfavor" if they agreed to join plaintiff in the development of the SDP Site; (3) Lipper, as chairman of the ICIB, repeatedly delayed consideration of Walentas' application to the ICIB for tax relief, which resulted in Lehman Brothers' declining to reach a formal lease agreement with plaintiff; plaintiff was eventually told that the application would be denied; (4) Lipper knowingly gave Councilwoman Ruth Messinger false and disparaging information about plaintiff which, in February, 1984, Councilwoman Messinger disseminated to the public in a press conference; (5) publicly stating that he would forward Councilwoman Messinger's allegations to the New York City Department of Investigations and actually doing so, Lipper directed the Commissioner of Investigations to issue a report confirming the allegations irrespective of their truth or falsity; (6) when the Department of Investigations did issue that report in March, 1984, Lipper, knowing the report to be false, distributed copies to the press; (7) in February, 1984, Lipper told a Daily News reporter, without first consulting either UDC or OPRHP, that plaintiff would not be the developer of the SDP Site; (8) on March 5, 1984, Lipper held a press conference, without consulting either UDC or OPRHP, during which he made false and disparaging remarks about Walentas and formally de-designated Walentas as developer of the site; and (9) on the same day, the president of PDC wrote Walentas a letter, at the direction of Lipper, informing Walentas that he had been de-designated as developer. See Walentas v. Lipper, 636 F.Supp. 331, 333-34 (S.D.N.Y.1986).
 
 
 12
 Walentas commenced the instant litigation on March 4, 1985, alleging that Lipper, acting under color of state law, had deprived Walentas of rights secured to Walentas by the federal Constitution, in violation of 42 U.S.C. Sec. 1983 (1982). On June 25, 1985, Lipper moved to dismiss the complaint for failure to state a claim upon which relief could be granted. See Fed.R.Civ.P. 12(b)(6).
 
 
 13
 On June 3, 1986, the district court issued an order dismissing the complaint insofar as it alleged a property interest in both "good faith consideration" of Walentas' application to become the developer of the SDP Site and an "expectation" that if Walentas complied with the terms of the Agreement, he would be selected as developer of the SDP Site. See Walentas, 636 F.Supp. at 334-36. The district court did not dismiss, however, Walentas' claim that he had been deprived of a protected liberty interest as a result of Lipper's defamation of Walentas occurring in connection with the announcement of Walentas' de-designation as developer of the SDP Site. Id. at 336-38.
 
 
 14
 Shortly thereafter, the district court certified to this court, pursuant to 28 U.S.C. Sec. 1292(b) (1982), the question whether Walentas sufficiently pleaded a section 1983 claim for deprivation of a liberty interest. However, we denied Lipper's consequent application for an interlocutory appeal on that issue. Lipper thereafter moved for summary judgment on the grounds that (1) he had qualified immunity from suit under section 1983 which required dismissal, since the state of the law was such in 1984 that Lipper did not violate clearly established statutory or constitutional rights of Walentas of which a reasonable person would have known; and (2) in any event, he had not violated any liberty interest of Walentas. On June 17, 1987, the district court granted the motion on the first ground and dismissed Walentas' complaint in its entirety. Walentas v. Lipper, 662 F.Supp. 902 (S.D.N.Y.1987).
 
 
 15
 Walentas appeals from the resulting final judgment of the district court dismissing his complaint, which brings before us as well the prior order partially dismissing the complaint. In Re "Agent Orange" Prod. Liab. Litig., 818 F.2d 179, 181 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988); Litchfield v. Spielberg, 736 F.2d 1352, 1355 (9th Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985).II. DISCUSSION
 
 
 16
 We accordingly consider seriatim Walentas' claims that a section 1983 violation occurred because Lipper, acting under color of state law, deprived Walentas of a constitutional (1) property interest and (2) liberty interest, and (3) was not excused by a qualified immunity under the doctrine of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
 
 
 17
 A. Property Interest.
 
 
 18
 To state a claim under 42 U.S.C. Sec. 1983 (1982), Walentas' "complaint must allege that the defendant deprived [him] of a right secured by the Constitution or laws of the United States and that such deprivation was committed by persons acting under color of state law." Costello v. Town of Fairfield, 811 F.2d 782, 784 (2d Cir.1987) (citing Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); Dwyer v. Regan, 777 F.2d 825, 828 (2d Cir.1985), modified, 793 F.2d 457 (2d Cir.1986)). The range of interests protected by section 1983 is limited. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id. at 577, 92 S.Ct. at 2709.
 
 
 19
 Moreover, while entitlement to protected benefits may be conferred by statute or by contract, see S & D Maintenance Co. v. Goldin, 844 F.2d 962, 966 (2d Cir.1988), it is relatively clear that a contract dispute, in and of itself, is not sufficient to give rise to a cause of action under section 1983, id.; Costello, 811 F.2d at 784. There is a distinction between the breach of an ordinary contract right and the deprivation of a protectible property interest within the meaning of the due process clause. See Brown v. Brienen, 722 F.2d 360, 363-65 (7th Cir.1983). In this connection, the Supreme Court has held that the term property does include an expectation of continued employment based upon a contract. Roth, 408 U.S. at 576-77, 92 S.Ct. at 2708-09; Perry v. Sindermann, 408 U.S. 593, 602-03, 92 S.Ct. 2694, 2700-01, 33 L.Ed.2d 570 (1972). In so holding, however, the Court has carefully limited the rule to situations which involve contracts with tenure provisions and the like, or where a clearly implied promise of continued employment has been made. Perry, 408 U.S. at 601-02, 92 S.Ct. at 2699-700; S & D Maintenance, 844 F.2d a 966-67; see Goetz v. Windsor Cent. School Dist., 698 F.2d 606, 608-09 (2d Cir.1983).
 
 
 20
 Courts have accordingly been wary of the consequences that might arise if section 1983 were expanded to encompass substantially all public contract rights. See Costello, 811 F.2d at 784; see also San Bernardino Physicians' Services Medical Group v. County of San Bernardino, 825 F.2d 1404, 1408-09 (9th Cir.1987); Brown, 722 F.2d at 364. Indeed, as this court has recently stated:
 
 
 21
 [T]he doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns, and we seriously doubt that Roth and its progeny portend such a result, although we do not reach the issue today. An interest in enforcement of an ordinary commercial contract with a state is qualitatively different from the interests the Supreme Court has thus far viewed as "property" entitled to procedural due process protection ... [W]e hesitate to extend the doctrine further to constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor ... However the contours of a protectible property interest may be shaped in the future, this case affords no occasion for any extension of existing doctrine because [plaintiff's] contracts do not provide it with entitlements within the traditional understanding of Roth.
 
 
 22
 S & D Maintenance, 844 F.2d at 966-67 (footnotes omitted).
 
 
 23
 Here, however, as in S & D Maintenance, we need not definitively resolve the question whether the contractual rights asserted by Walentas are of the kind protectible under section 1983, because they had not in any event achieved that concreteness of entitlement required by Roth and its progeny. This conclusion flows from consideration of the precise nature of the right whose deprivation Walentas claims.
 
 
 24
 Significantly, Walentas does not claim that he was employed by the city. Rather, he claims that he had a legitimate entitlement that he would be employed by the city in the future.[1] From the outset, therefore, Walentas' claim stands on a substantially different (and weaker) ground than the typical entitlement claim. Walentas asserts that the terms of the Agreement specifically guaranteed that he would be named final developer of the project, and that any subsequent administrative procedures and/or requirements that had to be satisfied were mere ministerial acts to be performed by the relevant state and local officials overseeing the project. This contention is without merit.
 
 
 25
 Walentas seeks to analogize his situation to cases where an applicant's interest in a permit or license has been held to be a constitutionally protected property interest. In such cases, however:
 
 
 26
 [T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted. Otherwise the application would amount to a mere unilateral expectancy not rising to the level of a property right guaranteed against deprivation by the Fourteenth Amendment.
 
 
 27
 Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 59 (2d Cir.1985) (emphasis added). Of course, "a theoretical possibility of discretionary action does not automatically classify an application for a license or certificate as a mere 'unilateral hope or expectation.' " Sullivan v. Town of Salem, 805 F.2d 81, 85 (2d Cir.1986). It is nonetheless clear that when an official action is truly discretionary under local law, "one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection." RR Village Ass'n, Inc. v. Denver Sewer Corp., 826 F.2d 1197, 1202 (2d Cir.1987) (citations omitted).
 
 
 28
 Under these standards, Walentas contends that the degree of discretion involved in his final designation was so limited by the terms of the SDP and the Agreement as to give rise to a property interest. This contention is belied, however, both by the language of the Agreement and by local law. The designation of Walentas as developer was clearly "conditional," despite the fact that the Agreement specified Walentas' obligations in some detail. The Agreement could be terminated "at any time" if the Agencies "in their sole discretion" were dissatisfied with the progress of the negotiations. Furthermore, the Agreement was a "memorandum of understanding," which provided that the parties would attempt to negotiate a "memorandum of intent." If those negotiations were successful, the parties would then try to negotiate a contract--a land disposition agreement.
 
 
 29
 Even assuming that all these negotiations bore fruit, no binding contract could come into existence until the New York City Board of Estimate, in the context of the city's Uniform Land Use Review Procedure, approved Walentas as the developer. New York City Charter Secs. 67(4), 197-c(f) and (i), 384. See Goodstein Constr. Corp. v. City of New York, 67 N.Y.2d 990, 992, 494 N.E.2d 99, 100, 502 N.Y.S.2d 994, 995 (1986) (expressing doubt that breach of contract action can be maintained for city's failure to approve a land disposition agreement, since Board of Estimate not bound by prior actions of other city agencies).
 
 
 30
 This court has recognized that Board of Estimate approval of a development project will be based upon political considerations and the climate of public opinion. See Citizens Comm. for Faraday Wood v. Lindsay, 507 F.2d 1065, 1072 (2d Cir.1974), cert. denied, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975). Thus, execution of a final, binding contract can in no sense be considered ministerial. On the contrary, Walentas' selection as developer would have been a discretionary determination by a political body which, as the district court correctly stated, plaintiff "had no right to expect." Walentas v. Lipper, 636 F.Supp. 331, 336 (S.D.N.Y.1986).
 
 
 31
 Since Walentas had no legitimate claim of entitlement to be named developer of the project, the district court correctly ruled that Walentas stated no claim against Lipper for deprivation of a constitutionally protected property interest in violation of section 1983.
 
 
 32
 B. Liberty Interest.
 
 
 33
 Walentas claims that he was also deprived of a protectible liberty interest. He contends that Lipper publicly defamed him, which caused Walentas to lose numerous employment opportunities, especially with respect to government contracts, and that Lipper did so in connection with a denial of public employment to Walentas. Walentas claims that this scenario brings him within the protection of section 1983 under the applicable precedents.
 
 
 34
 It is clear that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,"Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), a protectible liberty interest may be implicated that requires procedural due process in the form of a hearing to clear his name. Id. However, damage to one's reputation alone is not enough to implicate due process protections. Paul v. Davis, 424 U.S. 693, 701-02, 96 S.Ct. 1155, 1160-61, 47 L.Ed.2d 405 (1976). Rather, something more, such as discharge from governmental employment, must accompany the alleged public defamation. See id. at 701, 96 S.Ct. at 1160 (pertinent precedents do not "establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause").
 
 
 35
 This court has recently restated the applicable rule:
 
 
 36
 A government employee's liberty interest is implicated where the government dismisses him based on charges "that might seriously damage his standing and associations in his community" or that might impose "on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities."
 
 
 37
 S & D Maintenance, 844 F.2d at 970-71 (quoting Brandt v. Board of Coop. Educ. Services, 820 F.2d 41, 43 (2d Cir.1987) (in turn quoting Board of Regents v. Roth, 408 U.S. at 573, 92 S.Ct. at 2707)).
 
 
 38
 The district court found that "[s]uch a deprivation of liberty has been recognized not only where the individual is employed by the state, but where he seeks employment with the state and is denied it." Walentas, 636 F.Supp. at 337 (emphasis added) (citing Doe v. United States Civil Serv. Comm'n, 483 F.Supp. 539 (S.D.N.Y. 1980)).
 
 
 39
 In Doe, the plaintiff was denied a position as a White House fellow after being named a finalist for one of several such available positions. The file on her application compiled as a result of a government background investigation included accusations that the applicant was a thief, and the resulting report to the White House Fellowship Commission included those accusations without evaluation. The plaintiff claimed that she was never afforded an opportunity to defend against those charges, and accordingly brought suit claiming that she had been deprived of a protectible liberty interest. The court in Doe stated the rule "that the liberty interest protected by the Due Process Clause prohibits the government from depriving an individual of government employment on the basis of false charges and then aggravating the injury, and further diminishing employment opportunities, by tarnishing the individual's name and reputation," Doe, 483 F.Supp. at 570, and held it applicable with equal force to situations involving the possibility of employment. Id. at 569-70. In either case, the court concluded " 'the government's action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity.' " Id. at 569 (quoting Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230 (1961)). The district court below accordingly concluded that Walentas pleaded a liberty interest sufficient to withstand a motion to dismiss. Walentas v. Lipper, 636 F.Supp. at 336-38.
 
 
 40
 Not surprisingly, Lipper contends that no such liberty interest exists, claiming that Doe was wrongly decided.[2] We need not rule on this issue. Assuming arguendo that Walentas had a protected liberty interest, we concur in the district court's view that Lipper enjoyed a qualified immunity which precludes liability on his part for the invasion of that interest which Walentas alleges.
 
 
 41
 C. Qualified Immunity.
 
 
 42
 Walentas claims that the district incorrectly applied the standard of qualified immunity in concluding that Lipper was entitled to such immunity. Walentas v. Lipper, 662 F.Supp. 902, 903-04 (S.D.N.Y.1987). Walentas contends that the district court ignored an important component of that standard--the "objective legal reasonableness" of Lipper's conduct--and that Lipper's conduct could in no way be considered objectively reasonable. We disagree.
 
 
 43
 It is settled that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); see Procunier v. Navarette, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978). This rule seeks to accommodate conflicting values. On the one hand, there is a need to provide a remedy to those who suffer violations of their constitutional rights resulting from unlawful conduct by government officials. The only satisfactory remedy ordinarily is a civil damage action against such an official. See Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); Harlow, 457 U.S. at 814, 102 S.Ct. at 2736; Butz v. Economou, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978); see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 410, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring). However, allowing suits against public officials acting in their official capacities entails substantial social costs, such as "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." Harlow, 457 U.S. at 814, 102 S.Ct. at 2736; see Anderson, 107 S.Ct. at 3038. The rule of qualified immunity thus accomplishes a reasonable compromise of these considerations.
 
 
 44
 "Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson, 107 S.Ct. at 3038 (1987) (quoting Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738-39). Moreover, the legal rule alleged to be "clearly established" at the time must be sufficiently particularized: "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [I]n the light of preexisting law the unlawfulness must be apparent." Id. at 3039 (citing Malley v. Briggs, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1098-99, 89 L.Ed.2d 271 (1986); Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); Davis v. Scherer, 468 U.S. 183, 191, 195, 104 S.Ct. 3012, 3017, 3019 (1984)). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. If the law is not clearly established, summary judgment in favor of the official is usually appropriate. See Mitchell, 472 U.S. at 536, 105 S.Ct. at 2820; Hawkins v. Steingut, 829 F.2d 317, 322 (2d Cir.1987).
 
 
 45
 The district court granted Lipper's motion for summary judgment on the ground that Lipper was entitled to qualified immunity from suit under these standards. Walentas v. Lipper, 662 F.Supp. 902, 903-04 (S.D.N.Y.1987). In so holding, the district court properly inquired "whether it was clearly established in 1984 that public defamation of one seeking state employment (but not yet having obtained it), which impairs his chances for other employment, violates his constitutional right to liberty (of occupation) unless due process of law is followed." Id. at 904. Judge Stanton concluded that this proposition was not clearly established at the relevant time. Rather, "only one district court case had extended the principle to a situation where the individual had, as here, not yet obtained the employment and was denied it." Id. (citing Doe v. United States Civil Serv. Comm'n, 483 F.Supp. 539 (S.D.N.Y.1980)).[3] Such a right, the district court found, is " 'a nonobvious implication of the due process clause.' " Id. (quoting Colaizzi v. Walker, 812 F.2d 304, 308 (7th Cir.1987)). We agree with the district court that the right postulated in Doe was not clearly established at the time of Lipper's alleged malicious actions in early 1984. See supra note 3.
 
 
 46
 Notwithstanding the above, Walentas contends that the district court misapplied the qualified immunity standard. He claims that while the inquiry into whether the right was clearly established at the time of the challenged conduct is unquestionably important, it is equally crucial for a district court to independently inquire into the objective reasonableness of the official's conduct regardless of what the clearly established law was at the time. In other words, Walentas suggests that the test for qualified immunity is in fact a two part analysis.
 
 
 47
 Specifically, Walentas relies upon the following passage from Harlow v. Fitzgerald:
 
 
 48
 By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's act.
 
 
 49
 457 U.S. at 819, 102 S.Ct. at 2738 (emphasis added). He further contends that applying this standard, Lipper's conduct was manifestly unreasonable and unlawful, because Lipper used his public office and the shield of immunity to wage a personal vendetta.
 
 
 50
 However, we reject Walentas' argument that Harlow mandates the application of the two part test which he proposes. Rather, Harlow and its progeny make clear that the objective legal reasonableness of an official's actions must be viewed in light of the action's relationship to the clearly established law at the time, and not to some more general standards of reasonable and appropriate governmental conduct. Cf. Anderson v. Creighton, 107 S.Ct. 3034, 3039 (1987) ("if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of Harlow "). Thus, since the legal proposition argued by Walentas was not clearly established at the relevant time, Lipper's conduct was protected by qualified immunity. Even assuming that Lipper's conduct was unlawful in some sense, it is clear that officials sued for constitutional violations do not lose their qualified immunity solely because their conduct may violate some federal or state statute or administrative regulation. Davis v. Scherer, 468 U.S. 183, 194 & n. 12, 104 S.Ct. 3012, 3019 & n. 12 (1984).
 
 
 51
 In sum, the district court properly granted summary judgment in favor of Lipper on the ground that he was entitled to qualified immunity from suit with respect to the alleged violation of Walentas' right to be free from public defamation which impaired his prospects of future employment, since that constitutional right was not clearly established at the time of the challenged action.
 
 III. CONCLUSION
 
 52
 The judgment of the district court is affirmed.
 
 
 53
 VAN GRAAFEILAND, Circuit Judge, concurring in result:
 
 
 54
 I am convinced that, on an objective basis, no reasonably competent official in Lipper's position would have concluded that the acts described in the complaint herein would violate Walentas' constitutional rights. The constitutional status of public contractors vis-a-vis public employees was, and continues to be, in a state of uncertainty and flux. See, e.g., Lefkowitz v. Turley, 414 U.S. 70, 83, 94 S.Ct. 316, 325, 38 L.Ed.2d 274 (1973); S & D Maintenance Co., Inc. v. Goldin, 844 F.2d 962, 965-71 (2d Cir.1988); San Bernardino Physicians' Services Medical Group, Inc. v. County of San Bernardino, 825 F.2d 1404, 1407-10 (9th Cir.1987); Horn v. Kean, 796 F.2d 668, 671-79 and n. 10 (3d Cir.1986) (en banc). Accordingly, I concur in the result.
 
 
 
 [1]
 The district court noted Walentas' claim that he also had a property interest in good faith consideration of his application to become the developer for the SDP Site. Walentas v. Lipper, 636 F.Supp. 331, 334 (S.D.N.Y.1986). The district court agreed with Walentas that there was an implied obligation of good faith and fair dealing on the part of each side to the Agreement. Id. at 335; see Goodstein Constr. Corp. v. City of New York, 111 A.D.2d 49, 489 N.Y.S.2d 175 (1st Dep't 1985), aff'd 67 N.Y.2d 990, 494 N.E.2d 99, 502 N.Y.S.2d 994 (1986); Murphy v. American Home Products Corp., 58 N.Y.2d 293, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983). The district court, however, found that such an obligation "is a contract right, not a property interest," and thus not entitled to section 1983 protection. 636 F.Supp. at 335. We agree with the district court's conclusion on this issue
 
 
 [2]
 Walentas argues that Lipper should be foreclosed from raising such a claim, since he did not file a cross-appeal. In view of our disposition of this appeal, however, we need not reach that question
 
 
 [3]
 Although not cited by the district court or the parties, Bartel v. FAA, 725 F.2d 1403 (D.C.Cir.1984), had stated in January, 1984 that such conduct "may ... have effectively extinguished a legally recognized and protected interest," id. at 1415 (emphasis added), and Larry v. Lawler, 605 F.2d 954 (7th Cir.1978), had stated that a "requirement of allowing only written response to adverse information which may trigger a three year debarment may well amount to a denial of due process." Id. at 962 (emphasis added). We do not regard these cases, in combination with Doe, as clearly establishing the right for which Walentas contends in January-March, 1984. Further, we are in agreement with our concurring colleague that this general area of the law, particularly as it relates to public contractors, continues to be unsettled