**Alan B. WEISSMAN and Vivien K. Weissman, Plaintiffs,**

v.

**Irwin FRUCHTMAN, Robert Esnard, Irving E. Minkin, Herbert Sturz, Cornelius F. Dennis, Ronald Silvers, Maurice Beane, Joseph Aguirre, George C. Sakona, Jerome De Canio, Betsy Haggerty, Judith Spektor, William Valletta, Jeffrey Glen, Leo Weinberger, Louis Munoz, Melvin Sokal and the City of New York, Defendants.**

**No. 83 Civ. 8958 (PKL).**

United States District Court, S.D. New York.

June 4, 1991.

---

Liebman, Adolf & Charme (Stephen M. Charme, of counsel), New York City, for plaintiffs.

Victor A. Kovner, Corp. Counsel (Gabriel Taussig, Robin Binder, Jane L. Gordon, of counsel), New York City, for defendants.

## OPINION AND ORDER

LEISURE, District Judge.

This case is brought pursuant to 42 U.S.C. § 1983, and concerns a dispute arising from the defendants' regulatory actions relative to real property formerly owned by the plaintiffs. The convoluted procedural and factual history of this case is set out at

length in this Court's prior opinions. *See Weissman v. Fruchtman,* 700 F.Supp. 746 (S.D.N.Y.1988). The parties are currently before the Court on cross-motions for summary judgment on the remaining claims arising out of the refusal of the defendants to issue certain demolition orders.

## BACKGROUND

This action involves a challenge to the administration of the regulatory scheme under which the Department of Buildings ("DOB") determines whether a building is so unsafe as to require the issuance of an order to vacate or demolish the building. Plaintiffs also challenge DOB's alleged policy of avoiding the demolition of residential buildings in order to preserve single room occupancy housing in what is known as the "Special Clinton District" ("Clinton District") and particularly in the core area of that district, known as the "Preservation Area." [1]

The New York City Administrative Code (the "Code") empowers DOB to conduct inspections of privately owned buildings and to take a variety of measures to compel compliance with safety standards. Upon inspection, "if [a] building or property is found to be dangerous or unsafe, the commissioner [of DOB] shall cause such action to be taken as he may deem necessary, under and pursuant to the provisions of article 8 of this title." Code § C26–76.0.[2]

Under Article 8, DOB has the authority to order emergency demolition of buildings in imminent danger of collapse. It can also direct property owners to make necessary structural repairs, and may order the evacuation of an occupied building that poses an immediate danger to its occupants.

The Code also provides for the designation of a building as unsafe (an "Unsafe Building," or "UB," designation), and for the commencement of proceedings in state court (a "UB proceeding") if an owner refuses to comply with DOB directives to repair, remove or demolish unsafe structures. The court then determines, after a hearing, "whether the unsafe or dangerous structure or premises shall be vacated and repaired and secured, or repaired and secured, or taken down and removed...." Code § C26–80.5.

Plaintiffs are the former owners of the land and buildings located at 400–406 West 57th Street, New York, New York.[3] Both buildings contained residential apartments; some of the apartments in 400–404 are single room occupancy ("SRO") units.[4] On April 16, 1982, after plaintiffs had begun alterations on 406, they wrote to the then-Commissioner of DOB, defendant Irwin Fruchtman ("Fruchtman"), stating that their engineer and architect believed that "the very lives of the tenants presently in possession ... are threatened." Affidavit of Alan B. Weissman, sworn to on Feb. 14, 1990 ("Weissman Aff."), Exh. C.

On April 22, 1982, DOB inspected 406 and issued notices of violation directing repairs to be made, but did not order the premises to be vacated or demolished. Plaintiffs concededly did not undertake the specified repairs. On June 18 and 25, 1982, DOB again inspected 406, and again found a need for structural repairs, but no need to vacate or demolish the building. Meanwhile, in June 1982, plaintiffs had commenced a proceeding in the New York Supreme Court, seeking, *inter alia,* to compel DOB to order the evacuation of 406. In November 1982, the Court found that DOB had sufficient evidence reasonably to con-

---

1. These designations were made pursuant to Section 96–109 of the Zoning Resolution.

2. References to Code sections are to the section numbers existing at the time of the events at issue. The current versions of these provisions are numbered § 26–235 *et seq.*

3. Plaintiffs refer to the structures as three separate buildings, while defendants refer to 400 and 404 West 57th Street ("400–404"), which

were issued a single certificate of occupancy, as a single building, and 406 West 57th Street ("406") as a separate building. For convenience, the Court will follow its practice in prior opinions and refer to 400–404 as one building, and 406 as a separate building.

4. An SRO dwelling unit is one that shares a kitchen and/or bathroom with one or more other units.

clude that 406 was not in imminent danger of collapse, but that a temporary vacate order was necessary. *Weissman v. City of New York*, No. 1180/82 (Sup.Ct.N.Y.Co. Nov.1982). That decision was reversed by the Appellate Division on the ground of lack of jurisdiction, because of plaintiffs' failure to exhaust their administrative remedies. *Weissman v. City of New York*, 96 A.D.2d 454, 464 N.Y.S.2d 764 (1st Dep't), *app. dism.*, 60 N.Y.2d 815, 469 N.Y.S.2d 700, 457 N.E.2d 807 (1983).

By letter dated March 16, 1983, plaintiffs asked DOB to issue vacate orders for 400–404 and 406, on the ground that they were in danger of collapsing. DOB inspected the buildings on March 18 and 23, 1983, and again found structural defects but no need to issue a vacate order. On March 25, 1983, DOB issued an order requiring plaintiffs to undertake shoring in both buildings to prevent further deterioration. Plaintiffs did not comply.

Plaintiffs then commenced another state court proceeding, again seeking an order to vacate, as well as a stay of the shoring order. On or about April 7, 1983, DOB sent a team of senior officials to inspect the premises. After this inspection, DOB determined that conditions at 400–404 did not warrant a vacate order, but that the conditions at 406 did pose an immediate danger to its occupants. On April 14, 1983, DOB issued an order to vacate 406, pending repairs. DOB requested that a police guard be placed on the vacant building until plaintiffs sealed the windows and entrances, which was completed within weeks of the evacuation.

Plaintiffs commenced this action in December 1983. In January 1984, they applied for a permit to authorize them to demolish 406. The permit was denied on the ground plaintiffs had failed to comply with applicable housing regulations requiring the consent of the tenants. The denial of the application was upheld by the New York Supreme Court. *Weissman v. City of New York*, No. 16976/84 (Sup.Ct.N.Y. Co.1985). The state court decision regarding the denial of the permit was held to be *res judicata* in this action in a decision by now Chief Judge Brieant of this Court. *Weissman v. Fruchtman*, No. 83–8959 (S.D.N.Y. Oct. 31, 1985).

Further inspections of the two buildings were carried out in January and February 1984. However, DOB did not at any time order the demolition of 406, place a UB designation on the building or commence UB proceedings in state court; nor did it ever order that 400–404 be vacated or demolished. In January 1986, plaintiffs sold the land and buildings to a third party for $4.1 million.

Plaintiffs argue that defendants' failure to invoke its powers to issue vacate or demolition orders or to designate plaintiffs' buildings as unsafe constituted a violation of their constitutional rights to equal protection of the law and substantive due process, as well as a taking of their property without just compensation.

Plaintiffs seek partial summary judgment on the issue of liability. Defendants have cross-moved for summary judgment dismissing the complaint.

## DISCUSSION

### I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." " 'Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.' " *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir.1989) (quoting *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)).

The substantive law governing the case will identify the facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment.... While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 107 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). Only admissible evidence is properly considered on a motion for summary judgment. *See, e.g., United States v. Bosurgi,* 530 F.2d 1105, 1111 (2d Cir.1976).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Trebor Sportswear Co. v. Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 325, 106 S.Ct. at 2554.

■ Indeed, once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, which " 'must set forth facts showing that there is a genuine issue for trial.' " *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Delaware & H. Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson, supra,* 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsu-*

*shita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)); *see also Carey v. Crescenzi & Herenzy Realty Corp.,* 923 F.2d 18, 21 (2d Cir.1991). "The nonmovant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' or defeat the motion through 'mere speculation or conjecture.' " *Western World Insurance Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting *Borthwick v. First Georgetown Securities, Inc.,* 892 F.2d 178, 181 (2d Cir.1989), and *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 12 (2d Cir.1987)). In this case, in which both sides have moved for summary judgment, each must sustain the burdens of both movant and nonmovant to avoid summary judgment against it.

## II. Section 1983 Claims

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege " 'that the defendant deprived [him] of a right secured by the Constitution or laws of the United States and that such deprivation was committed by persons acting under color of state law.' " *Walentas v. Lipper,* 862 F.2d 414, 418 (2d Cir.1988), *cert. denied,* 490 U.S. 1021, 109 S.Ct. 1747, 104 L.Ed.2d 183 (1989) (quoting *Costello v. Town of Fairfield,* 811 F.2d 782, 784 (2d Cir.1987)).

Plaintiffs contend that 406 was not demolished or given a UB designation "because there was a policy not to demolish buildings in the Preservation Area, [which] was implemented to prevent the loss of any SRO units in the Preservation Area by stopping the development of all buildings." Plaintiff's Reply Memorandum ("Plain. Reply") at 6. Plaintiffs also argue that "[t]hat very same policy was also the reason that 400 and 404 were never ... vacated, let alone demolished on an emergency basis, or given a UB designation." *Id.* Plaintiffs' constitutional claims are that defendants' actions deprived them of substantive due process and equal protection, and that those actions constituted a taking of their property without just compensation.

## A. Substantive Due Process Claim

As a threshold issue, "to state a claim under the fourteenth amendment for deprivation of 'property' without due process of law," plaintiffs must establish that they have "a valid 'property interest' ... that was protectible under the fourteenth amendment at the time [they were] deprived" of that interest. *Brady v. Town of Colchester*, 863 F.2d 205, 211–12 (2d Cir. 1988); *see also Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170 (2d Cir.1991); *RRI Realty Corp. v. Incorporated Village of Southhampton*, 870 F.2d 911, 917–18 (2d Cir.), *cert. denied* —— U.S. ——, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989) (citing *Yale Auto Parts Inc. v. Johnson*, 758 F.2d 54 (2d Cir.1985)).

"Property interests flow not from the Constitution itself, but from 'existing rules or understandings that stem from an independent source such as state law.'" *Kelly, supra,* 930 F.2d at 175 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). "If the statute, regulation, or contract in issue vests in the state significant discretion over the ... conferral of [the benefit at issue], it will be the rare case that the recipient will be able to establish an entitlement to that benefit." *Id.* at 175.

An entitlement amounting to a property interest is present only if, " 'absent the alleged denial of due process, there is either a certainty or a very strong likelihood' " that the action desired by plaintiff would have been taken. *Brady, supra,* 863 F.2d at 213 (quoting *Yale Auto Parts, supra,* 758 F.2d at 59). "It is ... clear that when an official action is truly discretionary under local law, 'one's interest in a favorable decision does not rise to the level of a property right....' " *Walentas, supra,* 862 F.2d at 419 (quoting *RR Village Ass'n v. Denver Sewer Corp.,* 826 F.2d 1197, 1202 (2d Cir.1987)).

The Second Circuit has noted that land regulation claims are seldom submitted to a factfinder. *RRI Realty, supra,* 870 F.2d at 917. "Since the entitlement analysis focuses on the degree of official discretion and not on the probability of its favorable exercise, the question of whether a [plaintiff] has a property interest will normally be a matter of law for the court." *Id.* at 918.

If, under this analysis, a protectible property interest exists, "the principle of substantive due process assures property owners of the right to be free from arbitrary or irrational" actions by the government. *Brady, supra,* 863 F.2d at 215.

■ The instant case is somewhat unusual in that the property interest allegedly infringed does not involve the denial of an application for the issuance of a permit or zoning variance by a government entity, but rather the refusal of such an entity to invoke its police powers to confer the "benefit" of the evacuation and demolition of plaintiffs' buildings. Plaintiffs contend that, under section C26–80.5 of the Code, once a structure has been found to be unsafe DOB has no discretion, but must place a UB designation on that building and must commence UB proceedings if the owner does not comply with directives to repair, vacate or demolish the building.

■ The UB proceedings prescribed by the Administrative Code are clearly required when DOB seeks to demolish a building without the consent of its owner. *See Burtnieks v. City of New York,* 716 F.2d 982 (2d Cir.1983). However, there is neither a logical nor a statutory basis for plaintiffs' contention that New York law requires DOB to instigate UB proceedings for buildings that it has not determined to be in need of demolition, or that property owners who wish to demolish their buildings are entitled to the commencement of such proceedings by DOB. The Code, as quoted *supra,* clearly accords the commissioner of DOB discretion to take such action "as he may deem necessary" within the remedies provided for by Article 8. Code § C26–76.0.

New York law provides another avenue for property owners, that of applying for a permit for voluntary demolition, the denial of which may be challenged by either administrative appeal or an Article 78 proceeding in state court pursuant to N.Y.Civ. Prac. L. & R. 7801 *et seq.* Indeed, this

very procedure was invoked by plaintiffs in 1984 without success. However, plaintiffs' failure to obtain a permit hardly entitles them to UB proceedings in which a court might choose a more drastic remedy than that required by DOB's order.

Plaintiffs rely primarily on the testimony of Michael Wiener ("Wiener"), the deputy director of the Demolition and Sealing Division of the Department of Housing Preservation and Development ("HPD"), and that of defendant Irving E. Minkin ("Minkin"), a former deputy commissioner of DOB, for evidence of DOB procedures and the alleged policy concerning buildings in the Clinton District. Plaintiffs fail to establish, however, through the evidence of these witnesses or any other evidence, that a policy existed under which buildings in the area that would otherwise have been demolished were not vacated or demolished in order to preserve SRO housing, or that the buildings at 400–406 West 57th Street would have been demolished in the absence of this or a similar policy.

Minkin, for example, testified only that a previous commissioner of DOB, Jeremiah Walsh, "made a conscious effort to stop demolition in the preservation area," and that "it continued when his successors took over." Weissman Aff. Exh. O, Deposition of Irving E. Minkin, dated Sept. 1989 ("Minkin Dep."), at 122. Minkin further testified that these efforts included requests for additional patrols by the police in the vicinity of vacant buildings. However, he also testified that he had never known DOB to allow any building to remain standing that, in its opinion, posed an immediate danger to the public. Affidavit of Irving E. Minkin in Support of Defendants' Cross–Motion for Summary Judgment, sworn to on July 27, 1990, at 2.

Both Minkin and Wiener were asked whether the conditions at 406 were the type of conditions that caused buildings to be evacuated and demolished. Minkin testified only that similar conditions "might" lead to evacuation or demolition. Minkin Dep. at 125. He testified that he had no knowledge whether buildings with similar conditions had been vacated or demolished.

Wiener testified that he "rarely" saw buildings before they were demolished, but estimated that he had seen 50 or more such buildings. Wiener himself had not seen the buildings at 400–406 West 57th Street. When asked whether in his experience with HPD "any of the conditions" that existed at 400–406 "have also existed in buildings that have been demolished by HPD," he responded: "Conditions like this *might* be part of some of the buildings that we demolished." Weissman Aff. Exh. L, Deposition of Michael Wiener (undated) ("Wiener Dep.") at 140–41 (emphasis added).

Minkin also testified, in regard to general DOB policy, that a UB designation was not always given to buildings vacated as being in danger of collapse. He testified that one situation in which this would occur was "where the department issues violations directing shoring and believes for whatever reason that the issuance of [UB] proceedings is inappropriate," and that DOB was "loathe[ ] to authorize demolition of housing that can be preserved." Minkin Dep. at 81.

Minkin responded, when asked whether he knew why a UB designation was not placed on 406, that "the department had felt that the appropriate remedy for the defects here was to repair the building." *Id.* at 85. Wiener testified that he did not know why no UB designation was placed on the premises at 400–406 West 57th Street. Wiener Dep. at 39.

■ On the evidence submitted, plaintiffs have failed to show that their buildings were certain, or even likely, candidates for demolition. They have not shown either a property interest in a UB proceeding that might result in a demolition order, or that any DOB decision not to vacate or demolish their buildings was arbitrary or capricious. Given DOB's statutory discretion to take the actions it deems appropriate in connection with unsafe structures, plaintiffs have no property interest in any particular course of action by DOB. Therefore, plaintiffs' motion for summary judgment on its substantive due process claim is denied, and defendants' motion is granted.

## B. Equal Protection Claim

Plaintiffs contend that they were denied equal protection of the law because they allegedly were treated differently than owners of non-SRO property, or from owners of property outside of the Clinton District. The review of this claim falls under the "rational basis" standard. "Unless laws 'create suspect classifications or impinge upon constitutionally protected rights', it need only be shown that they bear 'some rational relationship to a legitimate state purpose.'" *701 Pharmacy Corp. v. Perales*, 930 F.2d 163 (2d Cir.1991) (quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 23, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18 (1989) (quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973))). "Under the rational basis test, the regulatory scheme ... is 'presumed to be valid,' ... and the [plaintiffs] must demonstrate that the ... classifications are not rationally related to any legitimate state objective." *Id.* (quoting *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)).

Plaintiffs concede that they do not claim that the regulatory scheme under which DOB acts is facially invalid, but challenge it as applied to them. Even where the administration of a facially neutral law allegedly discriminates against a suspect class, a plaintiff must prove purposeful discrimination. *See, e.g., Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Snowden v. Hughes*, 321 U.S. 1, 8–9, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). To prevail on this claim, plaintiffs must show both that the law was applied unequally, and that there has been intentional and purposeful discrimination "based on impermissible considerations such as ... intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609–10 (6th Cir.1980); *see also Rosa R. v. Connelly*, 889 F.2d 435, 439–40 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3225, 110 L.Ed.2d 671 (1990).

In addition to the testimony of Minkin and Wiener allegedly demonstrating a city policy to prevent demolition of buildings in the Clinton District, plaintiffs submit an HPD "Monitoring Report" on the "Unsafe Buildings Demolition and Seal-up Program." Weissman Aff. Exh. M. The report states that the Demolition Division of HPD "primarily acts as an agent for [DOB] in carrying out Supreme Court precepts obtained by DOB to permit City demolition of privately-owned unsafe structures.... The Division ... ensures that vacant buildings that are structurally sound and worthy of preservation are sealed while those which are unsound or do not represent a potential housing resource are demolished." *Id.* at 1.

The report notes that most of its sealing and demolition activities are conducted in communities suffering "slum and blight" conditions, and that the program's primary goal is that of "eliminating slums and blighting conditions." *Id.* at 8. The report lists the fourteen community districts in which its activities are concentrated, twelve of which are in the Bronx or Brooklyn, and only two of which are in Manhattan, in Harlem and the Lower East Side. Plaintiffs do not contend that the Clinton area suffered slum or blight conditions at the time of the events giving rise to this action.

Plaintiffs base a good deal of their argument on a comparison of the statistics concerning buildings demolished in the Preservation Area with those demolished citywide in an attempt to show discriminatory treatment. While such statistics are in any case meaningless without evidence of the condition of the buildings demolished, the very report submitted by plaintiffs undercuts their argument by showing that the vast majority of demolitions takes place in slum areas outside of Manhattan.

The Court need not linger over this claim. Even had plaintiffs shown unequal application of the law in this case, which has not been done on the record submitted, they have made no showing of any improper basis for defendants' actions. Plaintiffs

have shown no more than a policy of preserving existing residential housing wherever possible. Plaintiffs assert that a recent study done by the city, which concluded that any nexus between preventing development of SRO property and alleviating homelessness was indirect and conjectural, demonstrates that defendants had no rational basis for their alleged policy. However, this Court cannot discern the relevance of this study, conducted well after the events at issue in this case. Plaintiffs have utterly failed to present evidence that defendants acted in accordance with a policy to alleviate homelessness by preventing the demolition of dangerously unsafe buildings, or that defendants acted with any malice towards them.

In any event, plaintiffs' own evidence clearly establishes a rational basis for DOB's actions, that of concentrating demolition and sealing activities in the most blighted areas of the city, and of attempting to preserve housing units when feasible in all areas of the city. To the extent that plaintiffs have. offered any evidence of a deliberate policy to preserve the character of the Clinton District or the Preservation Area, that policy is a result of zoning regulations that have not been directly challenged by plaintiffs, and that undoubtedly constitute a permissible exercise of governmental powers. *Cf. City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1954); *701 Pharmacy, supra.*

Accordingly, defendants' motion for summary judgment on the equal protection claim is granted, and plaintiffs' motion is denied.

### C. Takings Claim

Plaintiffs' takings claim is based almost entirely on a recent decision of the New York Court of Appeals, which held that New York City Local Law No. 9, which prohibited the demolition, alteration or conversion of SRO properties and required their owners to restore the properties and to lease every unit at controlled rents for an indefinite period, was invalid as a both a physical and regulatory taking of private property without just compensation. *Seawall Assocs. v. City of New York,* 74 N.Y.2d 92, 544 N.Y.S.2d 542, 542 N.E.2d 1059 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989).

In their reply brief, plaintiffs abandon their claim that the DOB-ordered repairs to their property would have so expensive as to be confiscatory, and state that "[s]ince plaintiffs are not asserting on this motion that the directives to 'repair' in and of themselves constituted a taking, this court need not consider the issue as to whether the cost of repairs was confiscatory." Plain. Reply at 5. Accordingly, the Court will not address this issue.

Plaintiffs instead contend, without support, that they are entitled as a matter of law to develop their property. In arguing that any restraint on the ability to develop one's property constitutes an unconstitutional taking, plaintiffs misinterpret the jurisprudence on this subject. While the government may not authorize a physical occupation of property without compensation, *see Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), regulatory takings turn on the degree to which the regulation at issue affects the owner's beneficial use of his or her property. *See, e.g., Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Penn Central, supra,* 438 U.S. at 124–25, 98 S.Ct. at 2659.

While the New York Court of Appeals decision is in any case not binding authority upon this Court, it serves as an illustration of the type of imperative regulatory scheme that may be held to constitute a taking. In the instant case, however, no such intrusive regulation exists. There is no physical taking, and no blanket prohibition on the development of the property. Plaintiffs have not, in fact, shown any causal connection between defendants' actions or policies and a restraint on plaintiffs' developmental rights. Rather, plain-

tiffs' inability to develop their property is a result of laws not challenged in this action, which confer upon tenants of rent-controlled or -stabilized apartment buildings rights that limit the owners' rights to dispossess tenants and redevelop the property.

While it is true that, had DOB found demolition of 400–406 to be necessary, and had plaintiffs consented or had a court affirmed the DOB decision, plaintiffs' property could have been redeveloped. This Court, however, cannot find any evidence of a taking of plaintiffs' property in defendants' failure to invoke its police powers in these circumstances. Accordingly, plaintiff's motion for summary judgment on their takings claim is denied, and defendant's motion is granted.

### CONCLUSION

Plaintiffs' motion for summary judgment is denied. Defendants' motion for summary judgment is granted in its entirety, and the complaint is dismissed against all defendants.

SO ORDERED.