**S & D MAINTENANCE CO., INC.,
Plaintiff–Appellant,**

v.

**Harrison J. GOLDIN, Ross Sandler, Abraham Biderman, Kenneth Conboy, Steven Matthews, David A. Burns, and the City of New York, Defendants–Appellees.**

**No. 347, Docket 87–7582.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 29, 1987.

Decided April 14, 1988.

Jeffrey A. Aronson, New York City (Sacks, Montgomery, Pastore & Levine, New York City, on the brief), for plaintiff-appellant.

Stephen J. McGrath, New York City (Peter L. Zimroth, Corp. Counsel, Leonard Koerner, Marilyn Schechter, New York City, on the brief), for defendants-appellees.

Before FEINBERG, Chief Judge, NEWMAN and WINTER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal concerns primarily consideration of the circumstances under which a governmental contract may be said to create a property interest protected by procedural due process. S & D Maintenance Co., Inc. ("S & D") brought this suit under 42 U.S.C. § 1983 (1982), against the City of New York and six City officials,[1] alleging a denial of procedural due process in connection with the City's refusal to pay S & D for services rendered to maintain parking meters. The City had withheld payments to S & D pending a criminal investigation into the circumstances under which S & D obtained one of the meter maintenance contracts. The District Court for the Southern District of New York (Richard Owen, Judge) granted defendants' motion for summary judgment on the alternative grounds that (1) the requirements of procedural due process are satisfied by the availability to S & D of a post-deprivation remedy in state court for breach of contract and (2) a pre-deprivation hearing, even if normally required, need not be accorded when a related criminal investigation is pending. We affirm on the ground that S & D's contractual relationship with the City did

---

1. Comptroller Harrison J. Goldin, Commissioner of Transportation Ross Sandler, Commissioner of Finance Abraham Biderman, Commissioner of Investigations Kenneth Conboy, Assistant Comptroller Steven Matthews, and David A. Burns, former assistant to Commissioner Conboy.

not create a constitutionally protected property interest.

## Background

In June 1984, S & D entered into a contract with New York City to maintain the City's on-street parking meters for the two-year period from July 1, 1984, through June 30, 1986 (the "1984 contract"). In June 1986, S & D obtained a contract from the City to maintain the on-street meters from July 1, 1986, to June 30, 1988 (the "1986 contract"). Each contract was awarded by the City's Department of Transportation (DOT) after competitive bidding. Between July 1, 1986, and September 8, 1986, S & D submitted to the DOT Commissioner, Ross Sandler, three separate invoices for work performed in May and June 1986 under the 1984 contract and in July 1986 under the 1986 contract. These invoices were certified by Commissioner Sandler in the amount of $552,955.10, $453,411.29, and $636,112.39, respectively, and were filed with the City Comptroller, Harrison Goldin. Comptroller Goldin, however, refused to authorize the City Commissioner of Finance, Abraham Biderman, to pay these certified invoices, and S & D has allegedly not received payment for the meter maintenance work it undertook for the City after May 1, 1986.

On July 22, 1986, S & D President Henry Simpson sent a letter to the DOT seeking an explanation for the City's failure to pay the May 1986 invoice. Simpson was informed that the matter was being handled by the Office of the Comptroller, to which he subsequently made repeated written and oral requests for an explanation. According to Simpson, Assistant Comptroller Steven Matthews told him that payment would be suspended pending a "payment audit." Matthews allegedly refused to discuss the reason for the audit, its nature, or its anticipated duration. S & D wrote to Comptroller Goldin on August 15, 1986, requesting "immediate clarification" of the matter. Two weeks later S & D again wrote to Goldin seeking payment and complaining

that "despite letters, calls, etc., your organization ... refuses to discuss the matter and more important to tell us what the problem is, if there is a problem." S & D alleges that no response was ever made to these requests for information. By letter dated September 12, 1986, S & D again informed the DOT that payments had not been received for work performed after May 1, 1986, under both the 1984 and 1986 contracts, and threatened to cease performance under the 1986 contract if payment was not made by September 24. In response, the DOT twice informed S & D by letter that the Department had "acted in good faith and with due diligence" in processing the invoices, and that the City would consider S & D in default of the contract if it stopped work as threatened.

In late September 1986, before carrying out its threat to halt performance, S & D commenced two Article 78 proceedings, N.Y.Civ.Proc.L. & R. § 7801 (McKinney 1981), in the New York Supreme Court for orders in the nature of mandamus to compel payment of its invoices. In the course of these proceedings S & D learned, allegedly for the first time, that payment was being withheld pending a criminal investigation into corruption in City government. More specifically, affidavits submitted by Assistant Comptroller Matthews, David A. Burns, an examining attorney with the New York Department of Investigation (DOI) and a Special Assistant United States Attorney, and David Lawrence, an Assistant United States Attorney, revealed that the DOI and the United States Attorney's office were engaged in a joint investigation into the circumstances surrounding the award of the 1984 contract to S & D. Though details of the investigation were refused to S & D pursuant to Fed.R.Crim. P. 6, it became clear in the Article 78 proceedings that allegations of fraudulent procurement of the 1984 contract had been made against S & D and that the basis for these allegations was primarily the fact that S & D had retained Stanley Friedman, then Bronx Democratic Party leader,[2] to

---

2. Friedman was recently convicted on federal racketeering charges arising out of his role in City corruption. *United States v. Friedman*, No.

represent its interests before the DOT. S & D was also informed that the City would not pay for services rendered pursuant to either the 1984 or 1986 contract pending the outcome of the investigation. On October 17, 1986, the state judge determined that an Article 78 proceeding was not appropriate because the Comptroller's role in processing the invoices was not purely ministerial. Rather than dismissing the action, however, the judge permitted S & D to convert the mandamus proceedings into a consolidated plenary action on the contracts. The current status of this state court action is not clear from the record.

Upon learning of the City's intention not to pay pending the outcome of the investigation, S & D informed the DOT on October 8, 1986, that it would immediately suspend performance under the 1986 contract. That same day DOT Commissioner Sandler ordered a default hearing pursuant to Article 12 of the 1986 contract, which permits the Commissioner, after notice and hearing, to declare S & D in default for specified reasons, including abandonment. A default hearing was convened on October 14, 1986, but was adjourned at the request of the DOT pending the outcome of the Article 78 proceeding. After the conversion of the Article 78 proceedings, S & D twice requested without success that the default hearing be resumed. On December 31, 1986, Commissioner Sandler advised S & D that the 1986 contract was terminated, effective immediately, pursuant to Article 44 of the contract, which authorizes termination by the Commissioner without cause.

S & D commenced the present action on December 16, 1986. The complaint alleged ten causes of action, three under the Due Process Clause of the Fourteenth Amendment and seven under state law. The District Court granted defendants' motion for summary judgment on the federal claims and consequently dismissed the pendent state claims for lack of jurisdiction.

## Discussion

S & D contends that the defendant's actions have deprived it of both property and liberty interests without due process of law. We shall consider each alleged interest separately.

*Property.* The Supreme Court over the past two decades has enlarged the scope of interests protected by the procedural guarantees of the Due Process Clause. *See Board of Regents v. Roth,* 408 U.S. 564, 571 & n. 9, 92 S.Ct. 2701, 2706 & n. 9, 33 L.Ed.2d 548 (1972). This result has been accomplished in part through a broadened understanding of the word "property," as used in the Due Process Clause, to include rights to some governmental benefits conferred by statute, *see, e.g., Goldberg v. Kelley,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare payments), or by contract, *see, e.g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed. 2d 570 (1972) (tenured teaching position). The Court has suggested that a rationale for constitutionalizing some of these so-called "new property" rights is the functional importance of governmental benefits like welfare to citizens in contemporary society, *see Goldberg v. Kelley, supra,* 397 U.S. at 262 n. 8, 90 S.Ct. at 1017 n. 8 (citations omitted).[3] The Court has emphasized, however, that all interests warranting procedural protection as property rights require something in addition to their importance to the claimant: "To have a property interest in a benefit, a person clearly must have more than an abstract

---

86 Crim. 159 (WK) (S.D.N.Y.), *appeal pending,* No. 87–1134 (2d Cir. Sept. 17, 1987).

**3.** The term "new property," used to refer to those entitlements protected under *Goldberg* and its progeny, is taken from Reich, *The New Property,* 73 Yale L.J. 733 (1964). How best to justify the extension of procedural protections to these entitlements has been the subject of widespread academic debate. *See, e.g.,* Redish & Marshall, *Adjudicatory Independence and the Values of Procedural Due Process,* 95 Yale L.J.

455 (1986) (emphasizing core value of adjudicatory independence); Van Alstyne, *Cracks in "the New Property": Adjudicative Due Process in the Administrative State,* 62 Cornell L.Rev. 445 (1977) (emphasizing importance of freedom from arbitrary adjudicative procedures); Michelman, "Formal and Associational Aims in Procedural Due Process," in *Nomos: Due Process* 126 (Pennock & Chapman, eds. 1977) (emphasizing value of participatory and dignitary interests).

need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709.

The present case requires that we determine whether S & D has a contractual right giving rise to a "legitimate claim of entitlement" and thus a constitutionally protected property interest under *Roth.* In one sense, of course, every enforceable contract right can be said to be an "entitlement." As long as a state provides judicial remedies for the enforcement of contracts, either specific performance or damages for breach, every person holds a legitimate expectation that his contractually conferred rights are secure. And whenever a person contracts with a state, breach by the state can be considered a denial of his entitlement to performance of the contract. If the concept of "entitlement" were this expansive, federal courts could be asked to examine the procedural fairness of every action by a state alleged to be in breach of its contracts. Yet, as the Seventh Circuit has observed, "We must bear in mind that the Fourteenth Amendment was not intended to shift the whole of the public law of the states into the federal courts." *Brown v. Brienen,* 722 F.2d 360, 364 (7th Cir. 1983). The result would not be quite as unsettling as the Seventh Circuit apprehends, since constitutionalizing public contract rights would normally permit inquiry concerning only procedural regularity in connection with nonperformance, rather than the merits of the claim of contract breach.[4] And even if all public contract rights warranted the procedural protections of due process, there would be a substantial argument that in most circumstances post-deprivation state court remedies would provide all the process that is due.

Nevertheless, the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns, and we seriously doubt that *Roth* and its progeny portend such a result, although we do not reach the issue today. An interest in enforcement of an ordinary commercial contract with a state is qualitatively different from the interests the Supreme Court has thus far viewed as "property" entitled to procedural due process protection. *Goldberg v. Kelly, supra,* involved entitlement to welfare benefits conferred by statute upon our poorest citizens to provide for their immediate well-being, if not survival. *See also Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (due process protection for social security benefits). *Board of Regents v. Roth, supra,* and *Perry v. Sindermann, supra,* concerned claims to tenured status in public employment. *See also Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (claim to permanent civil service employment absent good cause for discharge). In these contexts, the Due Process Clause is invoked to protect something more than an ordinary contractual right. Rather, procedural protection is sought in connection with a state's revocation of a *status,*[5] an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits. Without doubt, *Goldberg, Roth,* and subsequent cases have accorded procedural due process protection to interests that "extend well beyond actual ownership of real estate, chattels, or money," *Board of Regents v. Roth, supra,* 408 U.S. at 572, 92 S.Ct. at 2706

---

4. In addition, rare cases might be imagined where denial of a contract right, if deemed to be Fourteenth Amendment property, would violate substantive due process. *See Schaper v. City of Huntsville,* 813 F.2d 709, 716–18 & n. 8 (5th Cir.1987) (collecting cases applicable to such a claim).

5. Indeed, the rise of modern procedural due process doctrine virtually reverses Sir Henry Maine's famous observation that "the movement of the progressive societies has hitherto been a movement from status to contract." H. Maine, *Ancient Law: Its Connection with the Early History of Society and its Relation to Modern Ideas* 182 (1861). *Goldberg* and its progeny recognize the rebirth of new forms of status in the modern administrative state.

(citations omitted). But we hesitate to extend the doctrine further to constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor.[6]

Thus far, the course of the law in this Circuit has not moved beyond according procedural due process protection to interests other than those well within the contexts illustrated by *Goldberg* and *Roth*. In *Costello v. Town of Fairfield*, 811 F.2d 782 (2d Cir.1987), we declined to recognize a constitutionally protected property interest in a claim for an alleged contractual increase in municipal retirement benefits. Noting that the claim turned on the interpretation of the retirement benefits contract, we observed, "A contract dispute, however, does not give rise to a cause of action under section 1983." *Id.* at 784. In *Signet Construction Corp. v. Borg*, 775 F.2d 486 (2d Cir.1985), we were willing to assume, in the absence of dispute by the parties, that a contractual right under a governmental contract constituted a protectable property interest,[7] an assumption that had no bearing on the outcome since we concluded that in any event the contractor had been accorded whatever process was due. Other courts of appeals have also been reluctant to surround the entire body of public contract rights with due process protections. *See, e.g., San Bernardino Physicians' Services Medical Group, Inc. v. County of San Bernardino*, 825 F.2d 1404 (9th Cir.1987) (denying due process protection for contractual right to supply medical services for four-year term); *Brown v. Brienen, supra* (expressing doubt that due process protection extends to contractual right to compensatory time off); *Casey v. DePetrillo*, 697 F.2d 22, 23 (1st Cir.1983) (per curiam); *Manning v. Lockhart*, 623 F.2d 536, 538 (8th Cir.1980) (per curiam). However the contours of a protectable property interest may be shaped in the future, this case affords no occasion for any extension of existing doctrine because S & D's contracts do not provide it with entitlements within the traditional understanding of *Roth*.

■ In determining whether S & D's contractual relationship with the City creates interests protected by due process, it will be helpful to distinguish between two aspects of the meter maintenance contracts. The first is an asserted right to continuation of the 1986 contract during its term, *i.e.*, a right to continue rendering service and to receive future payment. The second is an asserted right to prompt payment for services already rendered.

The continuation right would not be a protected right, even if we were to analogize S & D's service contract to an employment contract. In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause*. *Compare Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985) (property interest created by state civil service statute's for-cause termination provision), *and Arnett v. Kennedy, supra,* 416 U.S. at 166–67, 94 S.Ct. at 1650–51 (Powell, J., concurring) (property interest created by federal civil service statute's for-cause termination provision), *with Bishop v. Wood*, 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (no property interest due to absence of for-cause provision), *and Board of Regents v. Roth, supra,* 408 U.S. at 578, 92 S.Ct. at 2709 (same).

S & D does not contend that any New York statute conditions the City's termination of the meter maintenance contract

---

**6.** For an interesting effort to cabin the scope of interests entitled to procedural due process protection by drawing a line between employment contracts and all other contracts, *see Waltentas v. Lipper*, 636 F.Supp. 331, 335 (S.D.N.Y.1986), *appeal pending*, No. 87–7570 (2d Cir. Nov. 24, 1987).

**7.** In making this assumption, we relied on *Oberlander v. Perales*, 740 F.2d 116 (2d Cir.1984), which held only that under New York law a nursing home had a protectable property interest in retention of money previously paid to it "for services already performed in reliance on a duly promulgated [Medicaid] reimbursement rate," *id.* at 120.

upon a showing of good cause. Its termination claim therefore turns on whether the contract itself contains a for-cause provision sufficient to create a cognizable property interest. To make this showing S & D relies upon Article 12 of the 1986 contract, which "[i]n addition to those instances specifically referred to in other parts of this contract," authorizes the DOT Commissioner to declare the contractor in default and to terminate the contract upon the occurrence of any of fourteen enumerated conditions, including abandonment, unreasonable delay in performance, or bad faith failure to comply with the terms of the contract. Article 12 also requires the Commissioner to provide the contractor with notice and a hearing before finally declaring the contractor in default.

S & D's argument under Article 12 would be substantial were it not for additional termination provisions of the contract, particularly Article 44. Article 44 states without qualification that the Commissioner "may at any time terminate this Contract by written notice to the Contractor." The unconditional termination power conferred by Article 44 is fatal to S & D's asserted property interest in non-termination. Reading Article 44 with Article 12, we conclude that S & D holds no property interest in having its services retained throughout the term of the contract, but only a property interest in not being terminated on the grounds that it is in default. Presumably, this bifurcated scheme was adopted in recognition of the fact that a contractor who has defaulted on an obligation of $5,000 or more to the City of New York may become ineligible as a bidder on future contracts for a period of three years. *See* Section 345 of the N.Y. City Charter, 1 Administrative Code of the City of New York (1986). By including Article 12 in its contract with S & D, the City acknowledged that this consequence of future ineligibility was sufficiently serious to warrant a requirement of good cause, thereby creating a limited protected interest in non-termination because of default. No property interest, however, protects against termination under Article 44 in the absence of a declaration of default.

The lack of a property interest in continuation of the contract is not affected by the City's initial decision to proceed under the default provision of Article 12, nor by the fact that S & D may have been constructively terminated as of October 8, 1986, when it halted performance, prior to notification by Commissioner Sandler on December 31, 1986, of his decision to terminate under Article 44. *See McAdoo v. Lane,* 564 F.Supp. 1215, 1221 (N.D.Ill.1983) (constructive discharge of employee due to harassment constitutes deprivation under due process clause), *aff'd,* 774 F.2d 1168 (7th Cir.1985). Neither circumstance affects the constitutionally dispositive consideration—that the contract did not create a property interest in non-termination in the first place. Summary judgment was therefore appropriate as to those federal claims alleging a deprivation of property based upon the City's premature termination of the contract. S & D's remedy, if it exists at all, lies in state court for breach of contract.

■ The second contention advanced by S & D is that it has a protected property interest in prompt payment for services rendered pursuant to the meter maintenance contracts. According to this theory, S & D's due process rights were implicated by the City's decision to withhold payment on all invoices submitted by S & D, beginning with the May 1986 invoice. S & D bases this right primarily on terms in both the 1984 and 1986 contracts providing for interim payments for services rendered by S & D. Under these terms, contained in Article 41, the DOT Commissioner is authorized to file with the City Comptroller vouchers for partial payment for work performed under the contract. The Comptroller then has fifteen days under which to review the request and order final payment "less any and all deductions authorized to be made by the Comptroller under the terms of this contract or by law." S & D also contends that a property interest in prompt payment is created by two New York laws, Article 3–A of the New York Lien Law, N.Y.Lien Law §§ 70–79a (McKinney 1966 & 1988 Supp.), and N.Y.

Gen.Mun.Law § 106–b (McKinney 1986). The Lien Law declares that funds received by a general contractor in performance of public improvement contracts, and the right to receive those funds, are held by the contractor in trust for the benefit of his subcontractors and suppliers. N.Y.Gen. Mun.Law § 106–b sets forth the payment procedures that must be followed on contracts awarded "for construction, reconstruction or alteration of any public work project," and contains the following sentence relied on by S & D: "The public owner shall in accordance with the terms of the contract approve and promptly pay the requisition for the [interim] progress payments less an amount necessary to satisfy any claims, liens or judgments against the contractor which have not been suitably discharged...."

A close analysis of the sources of the alleged property right in prompt payment reveals the absence of a clear entitlement. The provision in the contracts for partial interim payments leaves it entirely in the discretion of the DOT Commissioner whether to request the City Comptroller to make interim payments.[8] Nor do the statutory provisions relied upon by S & D provide an entitlement. The lien provision, N.Y.Lien Law §§ 70–79a, which was enacted to protect laborers and subcontractors from being bilked out of their money by unscrupulous contractors, makes the contractor a trustee with respect to payments due and received but does not create a right to prompt payment. Finally, the payment procedures set forth in N.Y.Gen.Mun.Law § 106–b are unavailing because that provision pertains only to contracts for the "construction, reconstruction or alteration of a public works project." S & D's contracts were not construction contracts, but routine maintenance/service contracts, not within the terms of section 106–b.

In the absence of a prompt payment right grounded in the contracts or in the statutes S & D relies upon, we see no other basis in New York law on which such a right can be predicated. Indeed, the State's highest Court has said that "where work is done pursuant to an illegal municipal contract [*i.e.*, a contract fraudulently procured], no recovery may be had by the vendor, either on the contract or in *quantum meruit*," *S.T. Grand, Inc. v. City of New York*, 32 N.Y.2d 300, 305, 344 N.Y. S.2d 938, 942, 298 N.E.2d 105, 108 (1973) (citations omitted); *see also Jered Contracting Corp. v. New York City Transit Authority*, 22 N.Y.2d 187, 192, 292 N.Y.S. 2d 98, 102, 239 N.E.2d 197, 200 (1968), and the Comptroller has unfettered discretion to hold up payments based on this concern. The state court hearing S & D's Article 78 proceeding refused to compel payment on this basis: "The Comptroller is, as a matter of law, performing a discretionary function well-within the authority of his office by withholding payment of public monies pending the outcome of the audit and investigation." *S & D Maintenance Co. v. City of New York*, Ind. Nos. 22438/86, 22439/86, slip op. at 4 (N.Y.Sup.Ct.Oct. 17, 1986). A public contractor has no property interest, grounded in New York law, to prompt payment pending an investigation when the result of that very investigation will determine whether the City tenders payment or declares the contract void, at least where the delay does not exceed the reasonable delay contemplated by New York law. *Cf. Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir.1987) (delay in hearing to review denial of tow car medallions justified pending resolution of criminal charges against applicant). In the

---

**8.** Article 41, entitled "Partial Payments," is not a model of clarity. Its second paragraph states that "the Commissioner *may* from time to time, as the work progresses, but no oftener than once a month, make an estimate in writing such as in his opinion shall be just and fair of the amount of work done by the Contractor in the performance of this contract on his part" (emphasis added). Its fifth paragraph, however, states that the "Commissioner *will* prepare and certify, and the Commissioner will approve a voucher for partial payment in the amount of such approved estimate, less any and all deductions authorized to be made ... under the terms of this contract or by law" (emphasis added). We interpret paragraph five to provide for the procedures to be followed *if* the Commissioner exercises his discretion, under paragraph two, to initiate interim payments.

absence of a contractual or state law entitlement to prompt payment, we need not consider whether a prompt payment right, if otherwise established, could be interfered with, without some form of due process protection, by the State's power to defer payment pending an investigation to determine legality. *See Cleveland Bd. of Education v. Loudermill, supra,* 470 U.S. at 541, 105 S.Ct. 1493, 84 L.Ed.2d 494 (rejecting "bitter with the sweet" rationale that would deem due process satisfied by whatever procedural limits surround a state-created substantive right).[9]

■ *Liberty.* S & D's assertion of a constitutionally protected liberty interest also has two distinct components. First, S & D argues that it has been forced out of business, "tot[t]ering near bankruptcy, unable to get work," as a direct result of the City's alleged breach of the contracts and withholding of payments. However, even discharge from governmental employment will not by itself constitute a deprivation of liberty. *See Board of Regents v. Roth, supra,* 408 U.S. at 575, 92 S.Ct. at 2708. "[D]ismissal from a specific position [in government employment] does not amount to a loss of 'liberty' because the Court has held that one form of government employment foreclosed does not constitute a deprivation of freedom which is encompassed by that term." 2 R. Rotunda, J. Nowak, and J. Young, *Treatise on Constitutional Law* § 17.4, at 228 (1986) (citing *Roth*). Though S & D claims that the City's actions leave it without sufficient capital to pursue *any* line of work, the remedy lies in an action for damages under the contract. The fact that consequential damages of the alleged breach may be severe cannot convert a contract claim into a deprivation of liberty.

■ S & D's second liberty claim is that public statements made by certain defendants in connection with the corruption probe "have impaired S & D's good name, reputation, honor and integrity," preventing the company from securing other employment. Two statements are cited, one published on December 5, 1986, in *New York Newsday,* the other on February 6, 1987, in the *Daily News.* The *Newsday* article, entitled "Meter Firm Hired Despite Probe," reported that DOT Commissioner Sandler had awarded S & D the 1986 contract after being warned by DOI Commissioner Conboy of the imminent investigation into possible illegalities surrounding the 1984 S & D contract. The *Daily News* article summarized the adverse economic effects of numerous public corruption investigations on workers in New York, including S & D's meter maintenance workers. Both articles contained comments by City officials regarding the nature of the investigation and its effect on the 1986 S & D contract. The *Newsday* article quoted Comptroller Goldin as saying, "It is the mayor's policy that companies about which questions have been raised should not get city contracts." The *Daily News* article quoted Assistant Comptroller Matthews: "We knew exactly what we were doing [by terminating the 1986 S & D contract].... [W]e would not want to do business with a firm that may possibly be in serious legal or law enforcement difficulties."

We have recently summarized the applicable law:

> A government employee's liberty interest is implicated where the government dismisses him based on charges "that might seriously damage his standing and associations in his community" or that might impose "on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities."

---

9. In view of our determination that S & D has no property interest under New York law in continued employment or in prompt payment under the contract, we need not decide whether due process was provided prior to the alleged deprivation or whether S & D's pending action in state court for breach of contract provides an adequate post-deprivation remedy. *See Hudson*

*v. Palmer,* 468 U.S. 517, 531–33, 104 S.Ct. 3194, 3202–04, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 543, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds in Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986); *Marino v. Ameruso,* 837 F.2d 45, 47 (2d Cir.1988).

*Brandt v. Board of Cooperative Educational Services*, 820 F.2d 41, 43 (2d Cir. 1987) (quoting *Board of Regents v. Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707). To withstand summary judgment, however, "the employee must allege that the charges are false." *Brandt v. Board of Cooperative Educational Services, supra,* 820 F.2d at 43; *see also Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977) (per curiam). In the present case, no such claim of falsity can be made because the City officials quoted in the articles merely state the undisputed fact that S & D is under investigation for fraudulent procurement of the 1984 contract. The officials are careful not to offer their opinions as to the guilt or innocence of S & D. Whatever stigma attaches to S & D as a result of these articles is the result of the investigation itself, a matter of public record, and not any false statements of the City officials. S & D's claim is only the assertion that it has been deprived of liberty by City officials' public acknowledgement of the corruption probe, a clearly untenable position.

Because S & D fails to assert a property or liberty interest entitled to procedural due process, the judgment of the District Court is affirmed.