Gina **MALAPANIS** and **Computers Plus Center, Inc.**

v.

**Gregg P. REGAN, et al.**

**No. 3:03CV1758 (JBA).**

United States District Court, D. Connecticut.

Sept. 29, 2004.

David S. Samuels, James A. Wade, Robinson & Cole, Hartford, CT, for Plaintiffs.

Clare E. Kindall, Jane R. Rosenberg, Peregrine Alban Zinn–Rowthorn, James Sicilian, Michael P. Shea, Day, Berry & Howard–Htfd–Ct Cityplace I, Hartford, CT, for Defendants.

*Ruling on Motion to Dismiss by Defendants Regan, Bannon, Miller–Sullivan, and Blumenthal [Doc. # 26]*

ARTERTON, District Judge.

This action arises out of a dispute over computer equipment that plaintiffs Gina Malapanis ("Malapanis") and Computers Plus Center, Inc. ("CPC") sold to the State of Connecticut. Defendants include, *inter alia,* Greg P. Regan, Chief Information Officer for the State of Connecticut's Department of Information Technology ("DOIT"), Mark Bannon and Holly Miller–Sullivan, two managers with the DOIT, and Richard Blumenthal, Attorney General of the State of Connecticut (collectively, "defendant state officials"). These four state officials have moved pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6) to dismiss all claims against them. For the reasons discussed below, defendants' motion [Doc. # 26] is GRANTED.

## I. Background

According to plaintiffs' verified complaint, from 1993 to 2002, CPC was awarded several contracts to provide computers to various Connecticut state agencies. *See* Verified Complaint [Doc. # 1] at ¶¶ 16–18, 50–53, 95–96. Under one such contract awarded in approximately May 2002, CPC supplied five servers to the Connecticut Department of Information Technology ("DOIT"), which the DOIT claimed contained defective memory. *See id.* at ¶¶ 96–104. As a result of CPC's alleged impropriety with the servers, on August 8, 2002 the DOIT disqualified CPC's pending bid on a computer contract with the state and listed CPC as a non-responsible bidder. *See id.* at ¶¶ 112–113. On or about September 15, 2002, DOIT informed Malapanis that it was going to conduct an audit of all computers Malapanis and CPC supplied to every state agency in the preceding four year period. *See id.* at ¶ 117. Also on that day, Regan demanded, via letter, that "Malapanis perform an audit of all computers CPC delivered to all state agencies over the last four years and certify that all the computers delivered by CPC complied with the contract specifications." *Id.* at ¶ 120. Malapanis was unable to comply with the certification request within the four-day allotted time period, and alleges that the time allotted was "unreasonable, malicious and purposely designed so that Malapanis could not succeed." *Id.* at ¶ 122.

Plaintiffs continued to bid on new contracts and allege that despite being the lowest bidder, CPC was not awarded any more contracts by DOIT. Through its website, DOIT advised state agencies that "CPC was a 'non-responsible bidder' and that the agencies should 'use caution' when dealing with CPC or Malapanis." *Id.* at ¶ 133. In addition, Bannon and Holly Miller–Sullivan are alleged to have "maliciously and with the intent to deceive represented to state agencies that they should not utilize CPC's services." *Id.* at ¶ 134. In December 2002, DOIT informed all approved vendors, including CPC, that it was unilaterally terminating the 2001 Contract because of budget issues with the State of Connecticut. *See id.* at ¶ 131. Plaintiffs allege that CPC's contract was terminated because of CPC's status as a non-responsible bidder and Malapanis' failure to respond to the certification demand by Regan. *See id.* at ¶ 132.

On March 17, 2003, Regan and Connecticut Attorney General Richard Blumenthal held a press conference and issued a press release declaring that the state was initiating a civil action against CPC for "breaches of contracts for the provision of computer technology to the state," and accused Malapanis and CPC of "bilking the State out of more than a half million dollars, and possibly much more, worth of computer

equipment by providing the State thousands of computers that did not contain specified parts, while fraudulently charging the State for the missing items." *Id.* at ¶ 142 (quoting Press Release). On the same day, Regan filed an application for a prejudgment remedy against CPC in Connecticut Superior Court, attaching his own sworn affidavit in support. *See id.* at ¶¶ 143–44.

Plaintiffs allege that portions of Regan's affidavit in support of the PJR application were false. In particular, plaintiffs assert that Regan stated in his affidavit that Malapanis failed to provide two network adapter cards as required by the 2001 CPC Contract specifications, and that the state suffered monetary loss as a result of the server issue, but that at a later deposition, Regan testified that the 2001 CPC contract did not require two network adapter cards, and that the state suffered no financial loss as a result of the server issue. *See id.* at ¶¶ 145–46, 152.

Regan provided the same information to the Connecticut State Police in support of an application for a search warrant as he had in the PJR application. Relying on Regan's information, defendants Cabelus and Guida, detectives with the Connecticut State Police, obtained a "mere evidence" search and seizure warrant for CPC's office and Malapanis' residence, on grounds that there was probable cause to believe that the property seized would lead to evidence of larceny. *See id.* at ¶ 159. Officers with the Connecticut State Police subsequently executed the search warrant and seized all computers, files, pictures, CDS, and tapes from CPC. *See id.* at ¶ 165. Plaintiffs claim that as a result of the seizure of property, CPC has been unable to conduct its business and has suffered financial harm. *See id.* at ¶ 19.

Count 1 of plaintiffs' complaint is brought under 42 U.S.C. § 1983 and alleg-es procedural and substantive due process violations in that "Regan and Blumenthal recklessly and maliciously referred the matter to the [Connecticut State Police], as a result of which Malapanis' property was seized;" that "Regan and Blumenthal recklessly and maliciously issued a press release that contained false information;" that "Regan provided false and misleading information on his affidavit in support that he had probable cause for a PJR action;" that "Blumenthal refused to correct the fraud upon the court regarding the false information;" that "[t]he actions of the defendants were in excess of their statutory authority as officials of DOIT and the State of Connecticut;" and that "the accusations by DOIT and the defendants that Malapanis and CPC was a non-responsible bidder and that Malapanis and CPC likely committed larceny are unfounded, libelous, slanderous and made without due process of law." *Id.* at ¶¶ 181–82. Count 2 claims procedural and substantive due process violations under the Connecticut Constitution, and claims that the defendant state officials' conduct constituted a taking of Malapanis' property without just compensation. The remaining applicable counts allege abuse of process, defamation, tortious interference with contractual relations, and a violation of the Connecticut Antitrust Act. *See id.* at Counts 3–5, 8.

As plaintiffs clarified in their opposition to defendants' motion, they seek money damages, punitive and exemplary damages, treble damages, costs, and attorneys' fees against defendants Regan, Bannon, Miller–Sullivan, and Blumenthal in their individual capacities. Plaintiffs also seek an injunction ordering the defendants to expunge all records that relate the Malapanis and CPC being a non-responsible bidder; an injunction restoring the 2001 Contract to CPC and Malapanis, and an injunction requiring defendants Blumen-

thal and Regan to issue a press release and publicly withdraw their allegations against Malapanis and CPC made at the March 17, 2003 press conference and in the press release.

## II. Standard

When deciding a 12(b)(6) motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

A motion to dismiss under Rule 12(b)(1) is proper to contest the basis for the Court's subject matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). The plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *See id.* (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir.1996)).

## III. Discussion

The defendant state officials raise numerous grounds for dismissal of the claims against them, arguing that injunctive relief is barred by application of the *Younger v. Harris* abstention doctrine due to an ongoing state proceeding, or, in the alternative, by the Eleventh Amendment; that absolute immunity extends to Attorney General Blumenthal and Gregg Regan; that the federal claims are barred by qualified immunity; and, on the merits, that the § 1983 claims fail to state a claim upon which relief may be granted. Defendants also argue that plaintiffs' state law counts fail to state a claim, and that the Court should decline to exercise its supplemental jurisdiction over them if the federal claims are dismissed.

### A. Younger Abstention

■ Grounded in concerns of comity and federalism, the abstention principle set forth in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), requires that federal courts refrain from issuing injunctive relief impacting a pending state proceeding. Although *Younger* itself dealt only with a pending criminal proceeding, "*Younger* abstention has been extended to civil proceedings and state administrative proceedings, so long as the state court has a means of reviewing constitutional claims." *Cecos International, Inc. v. Jorling*, 895 F.2d 66, 70 (2d Cir.1990) (citations omitted). Absent a showing of bad faith, harassment, or other unusual circumstance, "*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D" Construction Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir.2002) (citation omitted).

■ *Younger* abstention is not required, however, when the federal claim involves money damages. "When money damages, as opposed to equitable relief, are sought, it is less likely that unacceptable interference with the ongoing state proceeding, the evil against which *Younger* seeks to guard, would result from the federal court's exercise of jurisdiction." *Kirschner v. Klemons*, 225 F.3d 227, 238 (2d Cir.2000). Thus, "even when a pending state proceeding raises identical issues," abstention and dismissal are inappropriate. *Id.*

The State of Connecticut has instituted both civil and criminal proceedings against Malapanis. While defendants have presented a compelling argument that these proceedings serve important state interests of addressing claims of fraud or larceny against the state and would allow Malapanis to raise her constitutional claims, and that there is no showing that these proceedings are brought in bad faith or only for the purposes of harassment, the Court concludes that it need not reach the *Younger* issue. Because plaintiffs seek money damages as well as injunctive relief, dismissal of this action on *Younger* grounds is not appropriate. While this Court has discretion to stay the action pending the conclusion of the state proceedings, it declines to do so because it finds, on the merits, that plaintiffs fail to state a cognizable § 1983 claim.

**B. Procedural Due Process**

■ To state a claim for a violation of procedural due process, plaintiffs must have a cognizable property or liberty interest. While plaintiffs' complaint does not identify the specific interests claimed, in their opposition to defendants' motion to dismiss they clarify that they claim a property interest in their status as a "responsible bidder" and in their 2001 Contract with the State, and a liberty interest in their reputation and ability to pursue future employment opportunities.

**1. Property Interest**

While it is well-established that a contract may give rise to a constitutionally protected property right, "[t]o have a property interest in a benefit, a person clearly must have . . . a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "It is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a [state actor] into a federal claim." *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 782 (2d Cir.1991) (quoting *San Bernardino Physicians' Services Medical Group v. County of San Bernardino*, 825 F.2d 1404, 1408 (9th Cir.1987)). Surveying the Supreme Court's due process jurisprudence in *S & D Maintenance Co. Inc. v. Goldin*, 844 F.2d 962 (2d Cir. 1988), the Second Circuit concluded that

the Due Process Clause is invoked to protect something more than an ordinary contractual right. Rather, procedural protection is sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits.

*Id.* at 966 (emphasis in original).

Although the Second Circuit in *S & D Maintenance* ultimately did not decide the limits of due process protection for contractual rights, it expressed hesitation "to extend the doctrine further to constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a

governmental contractor." *Id.* at 967. Thus far, the Second Circuit has found cognizable property interests in contracts only in the employment context, where the contracts include "tenure provisions and the like, or where a clearly implied promise of continued employment has been made." *Walentas v. Lipper*, 862 F.2d 414 (2d Cir.1988). Thus, employment contracts that bar the state from "terminating (or not renewing) the employment relationship without cause," are subject to the requirements of due process. *S & D Maintenance*, 844 F.2d at 967.

Analogizing to employment contracts in *S & D Maintenance*, the Second Circuit concluded that a contractual provision in a meter maintenance contract stating that the contractor could not be declared in default without good cause, and requiring notice and hearing before declaring the contractor in default, would create a property interest. *Id.* at 968. The court reasoned that the contracting parties created a "limited protected interest in non-termination because of default," likely because a contractor placed in default would become ineligible as a bidder on future contracts for a period of three years. *Id.* at 968. Another provision of the meter maintenance contract stated without qualification that the Commissioner "may at any time terminate this Contract by written notice to the Contractor." *Id.* The Second Circuit thus concluded that S & D Maintenance "holds no property interest in having its services retained throughout the term of the contract, but only a property interest in not being terminated on the grounds that it is in default." *Id.* Because S & D Maintenance was not in fact terminated on the basis of default, the Second Circuit held that its "remedy, if it exists at all, lies in state court for breach of contract." *Id.*

■ Plaintiffs claim a property interest in their 2001 CPC Contract with the State because they argue that DOIT could only terminate that contract upon a showing of good cause. Plaintiffs' claimed contract with the State, however, is at best a supply agreement, far removed from an employment contract conferring a cognizable property interest, and also distinct from the service contract at issue in *S & D Maintenance*. Plaintiffs' Verified Complaint describes the 2001 Contract as an agreement "to supply computers to state agencies as needed over a period of three years with an option to renew the contract yearly for up to 10 years." Verified Complaint [Doc. # 1] at ¶ 55 (contrasting 2001 Contract with more typical "spot bids," which were one time bids for a certain number of computers to be delivered). Several other manufacturing brands deemed "lowest qualified bidders" were also awarded the 2001 Contract, along with plaintiffs. *Id.* at ¶ 56 ("DOIT specified in the 2000 ITB that multiple 'lowest qualified bidders' would be awarded the contract."), ¶ 64 ("Other manufacturer brands, including but not limited to Compaq, were awarded the contract . . ."). As alleged, therefore, the 2001 Contract provided plaintiffs with no entitlement, only the expectation that the state would at some time within the three year term of the contract, on an "as needed" basis, choose them from among several manufacturer brands to supply the state with computer equipment. Plaintiffs' contract with the State is thus unlike the contract at issue in *S & D Maintenance*, which provided for the actual, not just expected, performance of meter maintenance services, and is closer to the contract considered in *Walentas*, which provided only an expectation of future employment. In *Walentas*, the Second Circuit found that the plaintiff, a developer who had entered into an agreement with agencies of the

City and State of New York granting him an "exclusive right to negotiate and thereafter execute a memorandum of intent . . . to be named the final developer of the project," had no cognizable property interest because "Walentas does not claim that he was employed by the city," only that "he would be employed by the city in the future." *Walentas,* 862 F.2d at 419.

In support of their claim that the 2001 contract provides them with a property interest, plaintiffs attach the 2001 contract to their opposition to defendants' motion to dismiss[1], and, relying on Paragraph 37, argue that like the contract at issue in *S & D Maintenance,* their contract could only be terminated for cause. Paragraph 37 states:

> The contract may be canceled or annulled by the Contracts & Purchasing Division upon nonperformance of contract terms or failure of the Contractor to furnish performance surety within ten (10) days from date of request. Any unfulfilled deliveries against such contract may be purchased from other sources at the Contractor's expense.

Standard Bid and Contract Terms and Conditions [Doc. # 35, Ex. A] at ¶ 37.

*S & D Maintenance 's* holding is not so broad as to transform any contractual provision allowing termination for nonper- formance, or failing to provide for unconditional termination, into a property right. Not least, the contract at issue in *S & D Maintenance* expressly provided for notice and hearing prior to termination on grounds of default, a provision that is not present in plaintiffs' 2001 contract with the State.

Moreover, while the Second Circuit's analogy to employment contracts in S & D Maintenance may have been apt, because the meter maintenance contract was for the performance of the service of maintaining the city's on-street meters, the employment analogy has only a tenuous connection to the supply contract at issue in this case. *See San Bernardino,* 825 F.2d at 1409–10 ("[T]he farther the purely contractual claim is from an interest as central to the individual as employment, the more difficult it is to extend it constitutional protection without subsuming the entire state law of public contracts."). Malapanis was supplying computer equipment, not performing a Government service or supplying goods for which the market was limited to Government agencies. The supply contract alleged in plaintiffs' complaint fails to confer a status characterized by permanence or dependence, and particularly in light of the Second Circuit's expressed hesitation to extend due process protection to temporary Government con-

---

**1.** Because this issue is before the Court on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), this Court "must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991). Although the 2001 Contract was not attached to the plaintiffs' verified complaint, the Court concludes that the complaint sufficiently incorporated by reference the contract at issue. *See* Verified Complaint [Doc. # 1] at ¶¶ 55–56, 62–64, 74–75. In light of the plaintiffs' reliance on the 2001 Contract in their Verified Complaint, and their inclusion of the contract itself in their opposition to defendants' motion to dismiss, there is no problem here of lack of notice to plaintiffs by treating the contract as part of the pleadings. *See, e.g. Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff. . . . Where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."); *Cue Fashions, Inc. v. LJS Distribution, Inc.,* 807 F.Supp. 334, 336 (S.D.N.Y.1992).

tracts, cannot be said to be within the limits of the due process clause.

Plaintiffs also characterize the "responsible bidder" designation given to contractors with the State as a property interest because the designation is necessary for future contracts with the State. As *Walentas* made clear, however, an expectation of future employment is insufficient to create a property interest. *See Walentas,* 862 F.2d at 419; *see also Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 250 (2d Cir.1985) (holding that the plaintiffs' expectation "to continue acting as a general contractor on public redevelopment projects" did "not rise to the level of a property interest."). *S & D Maintenance* is not to the contrary. Although the Second Circuit inferred from the terms of the contract that the parties themselves created a "limited protected interest in non-termination because of default," *S & D Maintenance,* 844 F.2d at 968, because a contractor in default would become ineligible as a bidder on future contracts, the Second Circuit did not hold that a property interest in bidding on future contracts existed in the absence of any contract what-soever in the absence of or some existing tenured or permanent status.

Moreover, "responsible bidder" status in no way creates an entitlement to a state contract. Plaintiffs state that the "nonresponsible status is significant because DOIT's ITBs state that DOIT will award the contract to the 'lowest responsible qualified bidder.'" Plaintiffs' Opposition

to Motion to Dismiss by defendants Regan, Bannon, Miller–Sullivan and Blumenthal [Doc. # 35] at 5. Plaintiffs direct the Court's attention to the 2001 CPC contract, which provides:

> Award will be made to the lower responsible qualified bidder. Past performance and financial responsibility shall always be factors in making this determination. The quality of the articles or services to be supplied, their conformity with specifications, their suitability to the requirements of the State, the delivery terms and administrative costs of the State as currently prescribed by the Contracts & Purchasing Division, will be taken into consideration in making the award.

Standard Bid and Contract Terms and Conditions [Doc. # 35, Ex. A] at ¶ 21.

Far from plaintiffs' characterization, this provision does not imply that the lowest responsible bidder will automatically be awarded the contract. Instead, it is explicit in reserving discretionary authority in the state agency to consider all aspects of the bid and its suitability to the needs of the State.

Accordingly, the Court concludes that plaintiffs cannot establish a property interest in "responsible bidder" status.[2] To the extent due process protection would extend at all to such status, it would have to be cognizable as a liberty interest, not a property interest.[3]

---

2. It may be the case that a "non-responsible bidder" would be precluded from obtaining contracts with the State. However, as discussed above, in the absence of a contractual provision giving a bidder some entitlement to future contracts, or establishing, by contract, a protected interest non-termination because of default, there can be no property interest in responsible bidder status. *See S & D Maintenance,* 844 F.2d at 968.

3. Plaintiffs' complaint also alleges a violation of the Fifth Amendment, and in their briefing plaintiffs allege that they have stated a valid claim based on the Takings Clause because they have a property interest in their status as a responsible bidder and in the 2001 CPC Contract. Because this Court has determined these claims do not give rise to a cognizable property interest, plaintiffs' Takings Clause claim is similarly dismissed.

### 2. Liberty Interest

A liberty interest is implicated where an individual is terminated or deprived of some tangible, legal status "based on charges that might seriously damage his standing and associations in his community" or that might impose "on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *S & D Maintenance*, 844 F.2d at 970 (citation and internal quotation marks omitted). "[W]hile damage to reputation alone is insufficient to establish a claim for harm to a liberty interest, a cognizable claim will lie if a plaintiff can show loss of reputation plus some serious additional harm, such as loss of employment, as a result of defamatory remarks by a government official." *Komlosi v. New York State Office of Mental Retardation and Developmental Disabilities*, 64 F.3d 810, 817 (2d Cir.1995) (citing *Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). Thus, in what is commonly described as the "stigma-plus" doctrine, a § 1983 plaintiff may establish a due process violation based on deprivation of a liberty interest by alleging stigma in connection with the deprivation of a tangible interest like employment, the publication of the stigmatizing charges, the falsity of the charges, and the denial of a name-clearing hearing. *See Donato v. Plainview–Old Bethpage Central School District*, 96 F.3d 623, 630–633 (2d Cir.1996).

Plaintiffs' deprivation of liberty interest claim centers on (1) defendants' designation of CPC as a "non-responsible" bidder, and (2) the press conference held by Regan and Blumenthal at which plaintiffs were accused of fraud and larceny. As plaintiffs' complaint alleges, on August 8, 2002, "Malapanis received a letter from DOIT that stated as a result of her alleged impropriety with the servers, DOIT was disqualifying CPC's bid on a wholly separate ITB that CPC had previously bid on.... DOIT also stated that CPC was now listed as a non-responsible bidder." Verified Complaint [Doc. # 1] at ¶¶ 112–113. Subsequently, DOIT "advised State agencies through its website that CPC was a 'non-responsible bidder' and that the agencies should 'use caution' when dealing with CPC or Malapanis." *Id.* at ¶ 133. Further stigma is alleged from a March 17, 2003 press conference, at which Regan and Blumenthal accused plaintiffs of "bilking the State out of more than a half million dollars, and possibly much more, worth of computer equipment by providing the State thousands of computers that did not contain specified parts, while fraudulently charging the State for the missing items." *Id.* at ¶ 141.

Plaintiffs' claim that these actions damaged their reputation could be cognizable only if they occurred in connection with the denial of employment or some other tangible interest. Plaintiffs link the stigmatizing publications to the termination of their 2001 Contract with the State, and also assert that the "non-responsible bidder" designation alone satisfies both the "stigma" and the "plus" elements of the constitutional test.

Plaintiffs' 2001 Contract with the State was terminated on or about December 20, 2002, when plaintiffs allege that "DOIT sent notice to all the approved vendors for the 2001 Contract that it was unilaterally terminating the 2001 Contract because of budget issues with the State of Connecticut." *Id.* at ¶ 131. Plaintiffs allege that "[u]pon information and belief, CPC was terminated and DOIT breached the 2001 CPC Contract because of CPC's status as a non-responsible bidder and Malapanis' alleged failure to respond to the certification demand by Regan." *Id.* at ¶ 132. In *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct.

1789, 114 L.Ed.2d 277 (1991), the Supreme Court held that to satisfy the "plus" element, the defamatory conduct must occur "incident to" and in conjunction with the termination of plaintiff's employment. *Id.* at 234, 111 S.Ct. 1789. Because "[t]he alleged defamation [a stigmatizing letter sent by former supervisor to prospective employer] was not uttered incident to the termination of Siegart's employment at the hospital" as it was written "several weeks" after Seigart voluntarily resigned from his position, the Supreme Court held that the plaintiff failed to establish a stigma-plus claim. *See id.* Siegert reasserted the Court's holding in *Paul v. Davis* that impairment of future employment opportunities alone does not give rise to a stigma-plus claim. *Id.* Likewise, in *Martz v. Valley Stream,* 22 F.3d 26, 32 (2d Cir.1994), the Second Circuit held that "a concurrent temporal link between the defamation and the [termination] is necessary" to succeed upon a claim of liberty deprivation. Because "Martz's last day of employment . . . was April 1, 1991," and "[t]he alleged defamatory statements of Williams were not published in the Maileader until September 19, 1991—more than five months later," the Second Circuit concluded that "it is clear that the statements were not made 'in the course of dismissal,'" and denied the due process claim. *Id.* at 32.

▮ Here, it is clear that the termination of the 2001 Contract in December 2003 cannot form a basis for plaintiffs' "stigma-plus" claim, because it lacks a temporal nexus with the August 2002 labeling of plaintiffs as a "non-responsible bidder" and with allegedly defamatory statements made by defendants during the March 2003 press conference. The termination of the 2001 Contract came approximately four months after the labeling of CPC as a non-responsible bidder, and approximately three months before the press conference.

A more difficult issue is whether the "non-responsible bidder" designation itself sufficiently implicates a liberty interest to give rise to a "stigma-plus" due process claim. To be cognizable, the "stigma" alleged must "go to the very heart of [the employee's] professional competence." *O'Neill v. City of Auburn,* 23 F.3d 685 (2d Cir.1994). Government imposition of a "tangible burden" on future employment prospects may satisfy the "plus" requirement. *See Valmonte v. Bane,* 18 F.3d 992, 1001 (2d Cir.1994). A determination of whether the non-responsible bidder label satisfies the stigma and "plus" elements thus would require examination of whether such a label would "significantly impede" Malapanis' ability to pursue her profession, *see O'Neill,* 23 F.3d at 693; *Valmonte,* 18 F.3d at 1002. The Court concludes that it need not reach this issue, because even assuming that the "non-responsible bidder" designation itself implicates a liberty interest, plaintiffs do not challenge the falsity of the core charges alleged to have formed the basis of the non-responsible label, and therefore have not pled the basis for their entitlement to a name-clearing hearing.

As an initial matter, it is important to recognize the charges that *are* challenged by plaintiffs. In a March 2003 press conference, plaintiffs were charged with "bilking the state out of more than a half million dollars, and possibly much more, worth of computer equipment by providing the State thousands of computers that did not contain specified parts, while fraudulently charging the State for the missing items." Verified Complaint [Doc. # 1] at ¶ 141. These charges, which form the basis of the state civil case that the State has brought against plaintiffs, are alleged by plaintiffs to be false. As discussed above,

however, the charges contained in the March 2003 press release came over seven months after CPC's designation as a non-responsible bidder, and thus lack the requisite temporal link to give rise to a stigma-plus claim. More importantly, these charges are not claimed to be the basis of the non-responsible bidder designation.

As alleged in plaintiffs' complaint, the non-responsible bidder designation was limited to problems DOIT experienced with five servers CPC supplied in 2002. Plaintiffs state that DOIT notified CPC in July 2002 that "the memory provided in the five servers was inadequate and that the servers did not work." Verified Complaint [Doc. # 1] at ¶ 102. In response to DOIT's complaint, "CPC contacted its Samsung distributer and replaced the allegedly defective Samsung memory with replacement Samsung memory. The servers still failed to work." *Id.* at ¶ 103. After the third effort to replace the memory, CPC alleges that the servers then worked properly. *Id.* at ¶ 104. Plaintiffs' complaint further alleges that Malapanis "was notified by DOIT that Regan, Bannon and Miller–Sullivan wanted to meet with her on or about July 30, 2002," that the meeting took place as scheduled, and that "she was informed by Miller–Sullivan at the meeting that took place on or about July 30, 2003[sic] that she initially failed to provide Dell memory and that she would be receiving a letter from DOIT in the near future regarding this server issue." *Id.* at ¶¶ 105–107. It was after this meeting, on or about August 8, 2002, that plaintiffs were informed that CPC was being listed as a non-responsible bidder. *See id.* at ¶ 112. Plaintiffs allege that the stated grounds for the non-responsible designation was Malapanis' "alleged impropriety with the servers."

While Malapanis alleges that "non-responsible bidder" designation was un-founded because she made efforts to fix the initial problem, and because the memory she provided was no different from that which would have been provided by Dell, Malapanis does not challenge the two core charges that DOIT made against her: that the initial servers she provided contained memory that did not work, and that she initially failed to provide memory from Dell. *See id.* at ¶ 103 (acknowledging that the "servers still failed to work," after she attempted to fix the earlier problem with the defective memory), ¶¶ 98, 99 (acknowledging that the memory she provided was not from Dell by stating that "the servers were purchased from Dell by CPC," and that "CPC added additional memory to meet the requirements of the 2002 Server Contract before it sent the servers to DOIT").

The charges that plaintiffs acknowledge in their complaint are not claimed to be insufficient for the non-responsible designation, given the highly discretionary standard set forth in the state's Standard Bid and Contract Terms and Conditions. *See* [Doc. # 35, Ex. A] at ¶ 21. The State of Connecticut's Standard Bid and Contract Terms and Conditions defines "lowest responsible qualified bidder" as "[t]he bidder whose bid is the lowest of those bidders possessing the skill, ability and integrity necessary for faithful performance of the work based on criteria set forth in the bid proposal and considering past performance and financial responsibility." Standard Bid and Contract Terms and Conditions, Definitions [Doc. # 35, Ex. A]. The Terms and Conditions further state that "[p]ast performance and financial responsibility," along with "quality of the articles or services to be supplied, their conformity with specifications, their suitability to the requirements of the State, the delivery terms and administrative costs of the State" shall all be considered in determining to whom to award the contract as the lowest re-

sponsible qualified bidder. *Id.* at ¶ 21. Thus, "responsible" bidder status is based on characteristics ranging from the financial responsibility of the contractor, to the quality of the goods' provided and the terms on which they were provided, to the contractor's past performance—characteristics which surely include the acknowledged failure to provide working memory that had been factory-installed by Dell.

"The Supreme Court has required only that a plaintiff raise the issue of falsity regarding the stigmatizing charges—not prove it—in order to establish a right to a name-clearing hearing." *Brandt v. Board of Co-op. Educational Services,* 820 F.2d 41, 43 (2d Cir.1987) (quoting *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977)). Here, plaintiffs have not satisfied this preliminary pleading standard. As plaintiffs' complaint does not challenge the falsity of the core charges claimed to have formed the basis of the non-responsible designation, they have failed to state a claim for entitlement to a name-clearing hearing based on a protectable liberty interest. Accordingly, plaintiffs' procedural due process claim is denied.

### C.  Substantive Due Process

Plaintiffs also claim a substantive due process violation, alleging that the actions of the state officials "constituted a gross abuse of power that is shocking to the conscience." Verified Complaint [Doc. # 1] at ¶ 181(b). In particular, plaintiffs allege that the DOIT defendants designated CPC as a non-responsible bidder, *see id.* at ¶¶ 112–113; informed a competitor of the plaintiffs that DOIT was investigating Malapanis and CPC, *see id.* at ¶ 119; gave Malapanis only four days to respond to an audit request, intending that Malapanis would not be able to comply, *see id.* at ¶¶ 120–21; and told other state agencies to "use caution" in dealing with Plaintiffs, *see id.* at ¶ 133. In addition, plaintiffs allege that "Regan and Blumenthal recklessly and maliciously referred the matter to the [Connecticut State Police]," *id.* at ¶ 181(c); that "Regan and Blumenthal recklessly and maliciously issued a press release that contained false information," *id.* at ¶ 181(d); that "Regan provided false and misleading information on his affidavit in support that he had probable cause for a PJR action," *id.* at ¶ 181(e); and that "Blumenthal refused to correct the fraud upon the court regarding the false information," *id.* at ¶ 181(f).

An "abuse of executive power so clearly unjustified by any legitimate objective of law enforcement [is] barred by the Fourteenth Amendment." *County of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). "Substantive due process is an outer limit on the legitimacy of governmental action. It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action. Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999) (citations omitted).

Plaintiffs' allegations do not satisfy this due process test. The charges against plaintiffs that Regan and Blumenthal made in the press conference tracked the charges that gave rise to the state civil suit against Malapanis, and Regan's allegations in the search warrant application formed the basis of initiating a criminal investigation. As such, they are fully correctable in the state court proceedings. The Court takes judicial notice, for example, of the fact that the probable cause determination

originally based on Regan's affidavit was upheld by the Connecticut Superior Court after the court discounted the allegedly false information provided by Regan. *See* Memorandum of Decision on Petitioner's Motion for Return of Seized Property, Case Nos. 03–2721SW, 03–2598SW, Connecticut Superior Court, Hartford Judicial District [Doc. # 25, Ex. A] at 9 ("Accordingly even if the assertion regarding the necessity of two NIC cards is excised from the warrant, ample probable cause remains for the issuance of a search warrant ..."). The remaining allegations plaintiffs make similarly fail as they cannot be said to be so "outrageously arbitrary" that they shock the conscience. *See Natale,* 170 F.3d at 263.

### D. Remaining State Claims

As plaintiffs' due process claims lack merit, the Court dismisses the federal § 1983 claims against defendants Regan, Bannon, Miller–Sullivan, and Blumenthal. Having dismissed the federal claims providing this Court with subject matter jurisdiction, this Court declines to exercise its supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction over a claim where "the district court has dismissed all claims over which it has original jurisdiction"); *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[N]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 306 (2d Cir.2003) (dismissal of federal claims at a relatively early stage

in the proceedings supports denial of exercise of supplemental jurisdiction). The state claims might best be brought as counterclaims in the pending state proceeding, or as a separate state lawsuit.

### IV. Conclusion

For the foregoing reasons, the motion to dismiss by defendants Regan, Bannon, Miller–Sullivan and Blumenthal [Doc. # 26] is GRANTED, and all federal § 1983 claims are dismissed. There are no further federal claims remaining in this suit, and this Court declines to exercise supplemental jurisdiction over the remaining state claims. Accordingly, the Clerk is directed to close this case.

IT IS SO ORDERED.